SANDERS *v.* THE STATE OF IOWA,

and

CERTAIN INTOXICATING LIQUORS AND CEPHAS SANDERS, WHO CLAIMS TO BE THE OWNER THEREOF *v.* THE STATE OF IOWA.

Where a complaint under the act for the suppression of intemperance, alleged that certain intoxicating liquors were "kept in a certain house occupied and kept by one S., on a certain lot, and intended by said S. to be sold unlawfully; and where a motion was made to quash the information, on the ground that while the liquor is charged as being in the house of defendant, no affidavit of a sale, at any time, was made as required by the proviso to the ninth section of the act, which motion was overruled; *Held,* That the motion was properly overruled.

The word "house" in the ninth section of the act for the suppression of intemperance, approved January 22, 1855, is not equivalent to the words "dwelling-house," in the proviso to said section.

Where certain intoxicating liquors were seized under the act for the suppression of intemperance, and the owner appeared and pleaded as a bar to the complaint and prosecution, a previous conviction of himself, for keeping said liquors for sale; *Held,* That the conviction of the owner for keeping, with intent to sell, is not a bar to a prosecution against the liquors themselves, as a nuisance, and for the abatement of the nuisance.

And where in such a proceeding, the court refused to instruct the jury, that if the jury find from the evidence, that the owner of the liquors had previously been convicted of keeping said liquors, with intent to sell, they must find for the defendant; *Held,* That there was no error in the refusal to give the instruction.

Where a motion was made in a criminal case, for a new trial upon the ground that after the jury had retired, and before they returned into court, with their verdict, two of the jurors separated from their fellows, and conversed with other persons about their verdict; which motion was supported by an affidavit, which alleged "that after the jury retired to consider their verdict in the above cause, on Monday evening, and before they had returned their verdict into court on the Tuesday morning following, two of the jurors separated from their fellows, and were in the office of the affiant, and conversed in his presence about the case; and that afterward, they were present when the verdict was presented to the court," which motion was overruled; and where it appeared from the record, that on the day of trial, the parties agreed that the jury should seal up their verdict, after agreeing upon it, and return it into court on the next morning, and that on the next morning the jury returned a written and sealed verdict; *Held,* That the affidavit did not show that the jurors conversed with *other* persons, and that there was no error in overruling the motion.

*Error to the Scott District Court.*

THESE cases were commenced under the Act for the Sup-
pression of Intemperance, approved January 22, 1855.   In
the first case above entitled, an information was filed before
a justice of the peace of Scott county, against the defendant,
charging him with a violation of section seven of the Iowa
liquor law.   On the 3d day of September, 1855, the defend-
ant appeared, pleaded not guilty, was tried, convicted, and
fined twenty dollars and costs, and the house declared a
nuisance, &c.   The defendant appealed to the District Court.
After filing motions to dismiss proceedings, and a demurrer
to the information (raising the questions now presented to
this court), and which were overruled, he was again tried
and convicted, and judgment was rendered by the District
Court against him, pursuant to the above-named section of
the liquor law.

The second case arose under the ninth section of the act.
On the 31st day of August, 1855, an information of three
citizens of the county, was filed before the same justice,
charging that the informants have reason to believe, and do
believe, that in said Scott county, to wit: in the city of
Davenport, in a certain house or place known and described
as being the house occupied and kept by one Cephas San-
ders, on the north end of lot three in block twenty-five, in
the old town (now city) of Davenport, intoxicating liquors
are kept by the said Cephas Sanders, to wit: brandy, whis-
key, and beer, and other intoxicating liquors, the particular
names of which affiants are not advised; and the said intox-
icating liquors are intended by the said Cephas Sanders to
be sold unlawfully, &c.   A warrant was thereupon issued
by the justice, which was returned served, by seizing cer-
tain intoxicating liquors therein described.   The justice then
issued a notice as required by the tenth section of the act,
returnable on the 7th of September, 1855, which was duly
served.   At the time set for the hearing in the notice, San-
ders appeared, claimed to be the owner of the property

seized, and was allowed to defend.   His counsel then moved'
to quash the proceedings, for the following reasons:

I. The information is defective and invalid, because that
while the liquor is charged therein as being in the house of
defendant, no affidavit of the sale of any liquor is made, as
the statute requires, before warrant of search can issue.

II. The statute upon which the prosecution rests, is in
contravention of, and in conflict with, the constitution of
the United States and the state of Iowa, in this:

1. It provides for the searching of houses, and seizing
of property, without first requiring a particular description
of the place to be searched and property to be seized.

2. It provides for the destruction of property, without no-
tifying the owner thereof, or making it necessary that he
should be notified.

3. It violates that provision thereof, which declares that
*the right of the people to be secure in their houses and effects
against unreasonable search, shall not be violated.*

4. It provides for the forfeiture and destruction of private
property, without trial, and as a penalty for a crime, *the com-
mission of which had not been proved.*

5. Because it is a criminal prosecution, and the law does
not make it necessary to inform the defendant of the accusa-
tion against him, *nor is it necessary that he should be confronted
with the witnesses against him.*

6. Because the statute under which the proceeding is com-
menced, is not a valid and existing law of Iowa, nor can be,
for that the legislature of the state, in the making thereof,
delegated the power of its taking effect, to the contingency
of a vote of the people in favor thereof.

7. It is invalid, in this, that it presumes the guilt of the
accused, and throws upon him the burden of proving his
innocence.

8. The act is in violation of the constitution of the state of
Iowa, for that it confers jurisdiction upon justices of the
peace, to adjudicate upon, and render final judgment upon,
an unlimited amount of property.

9. It authorizes the abatement and destruction of property

both real and personal, upon the mere fact that the liquor is found on the premises, and without any other proof.

Which motion, and also a demurrer to the complaint, were overruled. The defendant then filed his plea, as required by section ten of the act, and also a plea of former conviction; and after hearing the testimony, the justice adjudged that the liquor be forfeited, and that Sanders pay the cost of the proceedings. The defendant appealed to the District Court, where the same motion to quash the proceedings was heard and overruled, and a trial had before a jury. On the trial, the defendant asked the court to instruct the jury as follows:

1. That if the jury find, from the evidence, that Sanders, who claims to be the owner of the liquors seized, was arrested, and at the same time a prosecution was instituted against him, for keeping the said liquors with intent to sell the same, and was convicted of that offence upon the testimony that has been offered by the state, to sustain this charge against the liquors and himself, they will find for the defendant.

2. That if the jury find from the evidence, that for the same offence, that is to say, the keeping of the liquors seized, by Cephas Sanders, with intent to sell the same, the said Sanders has been before convicted, they must find for the defendant.

These instructions the court refused to give. By agreement, the jury was permitted to seal up the verdict after it was agreed upon, and return it into court on the next morning. The jury found a verdict for the state, and thereupon the defendant filed a motion for a new trial, upon the ground that after the jury retired to consider of their verdict, and before the same was returned by them into court, the jury separated, and after their separation, they, on the morning of the following day, returned into court a sealed verdict, and were not conducted into court by the officer who was sworn to attend them; neither were they in charge of an officer, when they came into court, and returned said verdict; and also because the verdict was against the law and evidence.

This motion was supported by the affidavit of Cavenaugh, which alleged that after the jury had retired to consider of their verdict, on Monday evening, and before they had returned the verdict into court on the following morning, two of said jurors—Palmer and Allen—separated from their fellows, and were in the office occupied by this affiant, and conversed in his presence about the case, and that afterwards the said jurors came into court, and were present when the verdict was presented to the court. The motion for a new trial was overruled, and thereupon a judgment of forfeiture was rendered against the liquors. From this judgment, the defendant sued out his writ of error, and in this court assigns the following errors :

1. In overruling the motion to quash the information.
2. In refusing the instructions asked for by the defendant.
3. In overruling the motion for a new trial.

*W. E. Leffingwell*, for the plaintiff in error.

These cases we propose to consider at the same time, and as one case, for the purposes of the argument, both arising under the same statute, and growing out of the same cause ; the prosecution in the first-named case, being based upon the seventh section of the act of January, 22, 1855, entitled "An act for the suppression of Intemperance," which prohibits the *selling ;* and the other, upon the ninth section of the same act, which provides for the *search, seizure and destruction* of liquors. This act, we think to be in conflict with the constitution of this state, and as some of the many objections to its validity, we urge the following: first, however, presenting to the court the fact, that the statute is in its nature a penal statute, and as such should be strictly construed. *Smith* v. *Spooner,* 3 Pick. 229 ; *Commonwealth* v. *Fourteen Hogs,* 10 Serg. & Rawle, 395 ; *American Fire Ins. Co.* v. *United States,* 2 Peters, 367 ; *Stuart* v. *Commonwealth,* 10 Watts, 309 ; *United States* v. *Wilson,* Bald. 101 ; *Fisher* v. *McGirr et al.,* 1 Gray, 1.

1. The act is in conflict with the first section of the bill

of rights, which enumerates among the inalienable rights of all men, the right of "*acquiring, possessing and protecting property.*" That intoxicating liquor is property, having an intrinsic value, recognized as an article of commerce, cannot be denied. It has been so considered by the Supreme Court of the United States, in *Brown et al.* v. *State of Maryland*, 6 Cond. Rep. 554; *M'Cullough* v. *State of Maryland*, 4 Cond. 466. It was so regarded in *Green* v. *Briggs*, 1 Curt. C. C. 337. And it is so recognized in the statute under consideration, which authorizes its purchase and sale by agents, upon the account, and for the *profit*, of the different counties of this state. Is not then the act, so far as it regards the selling of intoxicating liquor, within the inhibition of the constitution, above quoted? How can a man acquire property in a more legitimate manner, than by purchase? Yet he is restrained from purchasing, by reason of a penal statute prohibiting the sale of the article of property, which the declaration of rights says he may *acquire, possess and protect.*

We are aware that the Supreme Court, in the series of cases under the license laws, reported in 5 Howard, 540, have recognized the right of states to establish and control their own police regulations, by placing restrictions upon the sale of intoxicating liquors. And why have they come to this conclusion? They say, that it is because "we can find nothing in the constitution of the United States, or the laws of Congress, which authorizes us to interfere with such a policy adopted by the states." That court has gone no farther than to examine the constitution of the United States and the laws of Congress, and so long as a state law is not in conflict with them, it will not be disturbed by that Court. But the clause above quoted from the bill of rights, section one, is not to be found in the constitution of the United States. It is the first declared right of the people, in their reservation, upon the adoption of the constitution, and their distribution of the powers of the government under it. And although the state may, by her authority to establish police regulations, for the protection of the lives and health of her citizens, by the most rigorous laws, restrict the sale of

any article which may be deemed noxious or dangerous— yet, when the attempt is made to prohibit every, or any man, from *acquiring and disposing of* such property, the act of legislation which seeks to accomplish it, is in violation of the constitution. Restriction differs from prohibition, in this: Restrictions, however severe, may be imposed upon the sale of any article; yet every man has an opportunity of trafficking in that article, by bringing himself within the restrictions imposed by that law, and under it, he may " *acquire and possess*" property. But prohibit the sale of that article absolutely, and no man can " *acquire and possess*" it. Hence, under our constitution, a *restrictive* law may be properly enacted, but a law *prohibiting* the acquisition of property, cannot. In *Calder* v. *Bull*, 2 Dall. 389, the Supreme Court of the United States says: " The right of property is always subject to the rules prescribed by the positive law." What law is superior to, or more positive than, the constitution?

2. The next objection is, to the manner in which the law was enacted. The law was enacted to take effect as a law, upon the contingency that a majority of the voters of this state should, at the April election, 1855, vote in favor of its being the law, in which event, it should take effect on the first day of July next following. See § 18. This mode of enacting laws, is not in harmony with the constitution of this state. Upon its adoption, the people delegated to and vested in the General Assembly all legislative power (Art. 3, Const.), reserving to themselves, however, the right to express their approbation, or disapprobation, of a law in relation to the increasing of a state indebtedness, and in no other instance. Art. 7 Const. Having delegated this power to one of the co-ordinate branches of the government, by the constitution, they cannot re-invest themselves with it, until they have abrogated it. " Every government," says Judge STORY, " must include within its scope, at least if it is to possess suitable stability and energy, the exercise of the three great powers, upon which all governments are supposed to rest, viz.: the executive, the legislative and the judicial powers. The manner and extent in which these pow-

ers are to be exercised, and the functionaries in whom they are *vested*, constitute the great distinctions which are known in the forms of government." 2 Kent Com. 1. The legislature is, then, the law-making power, and the statute law, which is "the express written will of the legislature, rendered authentic by certain prescribed forms and solemnities" (1 Kent, 446), can be derived from no other source.

Among the forms and solemnities prescribed for giving effect to a law, the 3d article of the constitution, section 27, provides, that "no law of the General Assembly, of a public nature, shall take effect, until the same shall be published and circulated in the several counties of this state, by authority. If the General Assembly shall deem any law of immediate importance, they may provide that the same shall take effect by publication in newspapers in the state." Can effect be given to a law in any other way? *This Court* has already decided *that it cannot*. In the case of *Scott* v. *Clark et al.*, 1 Iowa, 70, in determining the effect of the law under which the question before the court arose, the court said, "That the power conferred upon the General Assembly by the 27th section of the 3d article of the constitution, *cannot constitutionally be conferred upon the Governor*, or any other person." In delivering the opinion of the court, in the case of *Parker* v. *Commonwealth*, 6 Barr, 518, Justice BELL refers to the remarks of Chief Justice BOOTH, of Delaware, in an analogous case, and quotes from that opinion as follows: "The absurd spectacle of a governor referring it to a popular vote, whether a criminal, convicted of a capital offence, should be pardoned or executed, would be the subject of universal ridicule; and were a court of justice, instead of deciding a case themselves, to direct the prothonotary to enter judgment for the plaintiff or defendant, according to the popular vote of a county, the community would be disgusted with the folly, injustice, and iniquity of the proceedings." And in the same connection, the court say: "And yet, these branches of the government derive their authority from the same instrument which confers the powers of legislation upon the General Assembly, and are

not more strongly restrained by its terms, than is the latter body, from devolving their duties and responsibilities upon others. But neither of these departments can absolve itself of the task appropriate to it, by substituting others, not called to its discharge by the constitution. None of them can legally invite the people, to exercise a function which the constitution makes the peculiar duty of selected bodies of persons, and therefore, in effect, *denies to every other person.* Nor can they call to their aid the mass of community, *except in the modes prescribed by the fundamental law.* To permit either of these courses, would be to loosen the hold of society from its greatest safety, by removing all accountability, and thus subjecting the minority to the unrestrained decisions of irresponsible and fluctuating majorities." *Parker* v. *Commonwealth*, 6 Barr, 519. It was said by Mr. Justice JOHNSON, in *Johnson* v. *Rich*, 9 Barb. 686 : "Of all the evils which afflict a state, that of unstable and capricious legislation, is among the greatest." Statutes, then, which claim no higher origin, than the will of the majority of a capricious people, are framed and erected upon an unstable and treacherous foundation, the duration of which is measured by their interests and passions—a foundation, which the receding flood may carry with it—a fabric, which the slightest gust of passion may sweep away. "*Salus populi suprema lex est*," is a trite and truthful maxim. But that law which will secure the *safety of the people*, must be built upon the rock of the constitution. *Barto* v. *Himrod et al.*, 4 Selden, 483 ; *Thorn* v. *Kramer*, 15 Barbour, 112 ; *Bradley* v. *Baxter*, 7 How. Pr. 13 ; *Parker* v. *Commonwealth*, 6 Barr, 517.

3. We insist that the 9th section of said act, is in direct violation of the 8th section of the bill of rights. The 9th section of the act provides, that "upon information of three residents of any county in the state, supported by oath, that they *have reason to believe*, and do believe, that intoxicating liquor, described *as particularly as may be*, is in any place in said county, described *as particularly as may be*, kept or owned by any person, named or described *as particularly as*

*may be,* and is by him intended to be sold, &c., the warrant of search may issue, directing the officer to search the premises, and seize the liquors, and deposit them in some secure and convenient place, until the determination of the cause." The 8th section of the bill of rights declares: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures and searches, *shall not be violated;* and no warrant shall issue but on probable cause, *supported by oath* or affirmation, *particularly describing the place to be searched, and the papers and things to be seized."* Under the act of January 22, 1855, the information is not required to issue against any particular thing, or for the search of any particular place. It is, in its character, a general warrant, which issues not upon *probable cause, supported by oath,* but issues upon the bare suspicion of a cause, a suspicion which is not justified by the bill of rights. General warrants have ever been in bad odor; in this country, they have been strongly guarded against by the framers of the constitution; in England, before its adoption, they were discountenanced, and since the decision of Lord Camden, in *Eutich* v. *Carrington,* 2 Wils. 275, and 19 Howell S. Trials, 1029, are entirely unknown.

The act pre-supposes the guilt of the owner, if one shall appear and claim his property, although that owner need not be notified (unless known to the officer), and if he does not appear, then the property is declared forfeited. And for what cause? It is not necessary that any proof should be adduced upon the hearing, that the liquor seized was kept for the purpose, and with the intent of the owner, to be sold—for that owner or keeper's name had not been mentioned in the complaint or warrant. The information is filed, stating the belief of the informant, that it is kept for the purpose of sale. That informant need not again appear. The officer makes the search and seizure under the warrant, and he returns that he has found liquor; if no owner appears, the liquors are declared forfeited, and destroyed, and this under the authority of the act. Is this consistent with the provisions of the constitution, which guarantees to every

man the enjoyment of his property? Is he protected in the possession of it? It will undoubtedly be claimed, that it is destroyed as a nuisance. But where is the judgment which declares it a nuisance—which confiscates it, and wrests it from the possession of its owner? It is found in the *sentence* of the act, and not upon the records of the court, supported by the law and the proof. Before search or seizure—before the complaint is filed, or warrant is issued—the judgment is pronounced; and pronounced by a tribunal (the legislature), omnipotent in its proper sphere—in the exercise of "such powers as have been delegated to it"—yet when it steps beyond that boundary, its acts, like those of the humblest magistrate, who transcends his jurisdiction, are void. 4 Hill, 144. "Their acts are mere legislative acts; and when they attempt the exercise of *judicial* functions, under color of the grant, they are mere acts of usurpation, without validity or force." *Wilkinson* v. *Leland,* 2 Peters, 627; 1 Gray, 1; 5 Hill, 367; 5 Cowen, 348. It is not a law ; "it is in the form of a law, but is in substance a decree." *Jones* v. *Perry,* 10 Yerger, 59. And in *Wilkinson* v. *Leland,* 2 Peters, 657, Judge STORY says, "That government can scarcely be free, where the estate of the citizen can be transferred, *without trial, without notice, and without offence.*"

So, in *Doe* v. *Douglass,* 8 Blackf. 10, the court says: "The legislature is supreme, except wherein restrictions have been imposed. The restrictions of the constitution restrain the legislature from the *performance of a judicial act,* and from any flagrant violation of the rights of private property. See also, 9 Gill & Johns. 408; 13 Wend. 328; 2 McCord, 55; 4 Dev. 1; 3 Greenl. 326. That "no man shall be deprived of life, liberty, or property, without due process of law," is a familiar maxim, which was incorporated. into *Magna Charta,* nearly three hundred years before the discovery of this continent; it was made the essence of the 29th chapter of that instrument, when the barons of England *demanded it, as a right for the people.* It has ever been regarded with jealous care, by our statesmen and jurists, and well might

we shudder at the thought of its being torn from the shield of our rights, by the hand of reckless legislation.

The accused, in the defence of his life, his liberty, or his property, may plant himself upon the constitution, and *demand*—not ask—what he has secured to himself by it—the right of trial by jury; that the charge against him shall be clearly and specifically set forth against him; that he be " *informed of the nature of the accusation against him ;* that he be confronted by his accusers;" and that he may have his own witnesses. This is his right, and this is the mode, the only mode, of affecting, his life, liberty, or property, for an offence committed by him. 10th article of the bill of rights. These are the rules prescribed, and this the character of evidence required; and in the language of Lord ERS-KINE: " The rules of evidence, as they are settled for the general administration of justice, are not to be overruled or tampered with. They are founded in the charities of religion—in the philosophy of nature—in the truths of history —and in the experience of common life; and who ever ventures rashly to depart from them, let him remember, that it will be meted to him in the same measure, and that both God and man will judge him accordingly." 24 How. State Trials, 965. Then, if the opportunity is not given him by the act, to meet his accuser face to face, the law is unconstitutional. *Commonwealth* v. *Albro ; Fisher* v. *McGirr et al. ; Herrick* v. *Smith,* 1 Gray, 1; *Green* v. *Briggs,* 1 Curt. C. C. 311; 4 Hill, 140; 9 Gill & Johns. 408; 7 Porter, 294; 1 Murphy, 87; 5 Hill, 359. In *Jones* v. *Perry,* 10 Yerger, 59, the court say, that, "the legislature cannot sit in judgment, try causes, and apply the rules of law to them, make decrees, and much less can they make decrees in the exercise of an arbitrary power, independent of, and in opposition to, the rules of law."

This act, also, confers jurisdiction on justices of the peace, to adjudicate and pronounce judgment of forfeiture upon an unlimited amount of property (*Commonwealth* v. *Albro,* 1 Gray 1), while the constitution, art. 11, sec. 1, limits and defines the extent of their jurisdiction.

In the very recent cases of the *Commonwealth* v. *Albro ;* *Fisher* v. *McGirr* ; and *Herrick* v. *Smith*, 1 Gray, 1, the Supreme Court of Massachusetts unanimously say, that the Massachusetts act, which is precisely like our own, " is contrary to the 8th section of the bill of rights, declaring the subject to be free from unreasonable searches and seizures, because it neither requires the name of any person keeping said liquor, with intent to sell the same, to be named in the complaint or warrant of search—nor limits the officer's right and authority of seizure, to the liquors described in the complaint. This section also disregards other precautions and safeguards for the security of persons and property, described by the declaration of rights, inasmuch as it prescribes for the destruction of private property, and the punishment of its owner or keeper, without his being summoned (unless known to the officer) to appear before a magistrate, and without giving him an opportunity to defend, and meet his witnesses face to face, and providing legal proof and trial of the offence of keeping the liquors, with the intent to sell the same. This section, therefore, is unconstitutional and void, even when so framed and conducted as to avoid these objections."

We simply present the objections embraced in our 3d, 4th, and 5th assignments of error, in the case against the liquors, &c., viz : The exclusion of the record of a former conviction, offered in evidence by the defendant ; the refusal of the court to instruct the jury as to the effect of a former conviction, as requested by the defendant ; and the overruling of defendant's motion for a new trial, which was supported by an affidavit, that the jury, after they retired to consider of their verdict, separated and conversed with other persons, before they had agreed upon, and returned their verdict into court ; that they may be considered by the court, believing that either of the errors assigned, would be sufficient to reverse the judgment. The other objections, we more strongly urge, feeling the importance of an early construction of the statute under consideration. Neither are we insensible to the extreme solicitude which courts feel, when called on to

disturb an act of the legislature, upon the ground of its un-constitutionality; and its operation is never retarded, unless the defect is apparent. But when its defects are clearly seen, the judiciary have boldly grappled it, and with a steady hand applied the amputating knife, to relieve the constitu-tion of those festering spots, which threatened to mar its beauty, and impair its strength.

. *Cook & Dillon*, for the state.

We now proceed to consider the various errors complained of, premising, however, that in consequence of the elaborate, able, and learned argument of the attorney-general,[1] we shall discuss the points which are presented, much more briefly than we otherwise should, in a case of such magni-tude, and involving questions so momentous and important. The first error assigned is, that "The legislature had no power to submit the passage of the law to the people of Iowa."

The able argument of the attorney-general on this point, has left us little to add; and that little we shall add mainly, by quoting from the opinion of REDFIELD, C. J., in the case of *State of Vermont* v. *Parkes*, as reported by himself in Livingston's Law Mag., January, 1855, 13. After review-ing the decisions in Delaware, New York, and Michigan, and showing them not to be in point (nor are they in point under the Iowa Liquor Law), he says: "In regard to the statute of 1852, it cannot with any degree of fairness be said [and this is true in respect to the law now under con-sideration], that the legislature did not enact the law, and fully pass upon all questions of constitutionality or expe-diency involved in the subject." "*It is admitted on all hands,* that the legislature may enact laws, the operation or suspen-sion of which, shall be made to depend upon a contingency. This could not be questioned with any show of reason or

---

[1] These cases, and the preceding case of *Santo et al.* v. *The State*, were heard together, and the argument of all of them, were participated in by the respective counsel engaged. The argument of the attorney-general, referred to by Messrs. Cook & Dillon, is given in the preceding case.—REPORTER.

sound logic. It has been practiced in all the free states, for hundreds of years, and no one has been lynx-eyed enough to discover, or certainly bold enough to declare, that such legislation was, on that account, void or irregular. And it is, in my judgment, a singular fact, that this remarkable discovery, should first be made in the free representative *democracies* of America." "It seems to me, that the distinction attempted between the contingency of a *popular vote*, and other *future uncertainties*, is without all just foundation. in sound policy or correct reasoning. And we may find any number of cases in the legislation of Congress, where statutes have been made dependent upon the shifting character of the revenue laws, or the navigation laws, or commercial rules, or the restrictions of other countries." "The same is also true of acts of Congress, by which power is vested in the president, to levy troops or draw money from the public treasury, upon the contingency of a declaration or an act of war, committed by some foreign state, empire, kingdom, prince, or potentate. If these illustrations are not sufficient to show the fallacy of the argument, more would not avail." See *Commonwealth* v. *Williams*, 11 Penn. 61; 8 Barb. 391; 9 Ib. 685; 10 Ib. 214; 20 Ohio, App. 1; and others cited by REDFIELD, C. J. There is no doubt of the principle, that such parts of a statute only will be adjudged void, as plainly and palpably conflict with the constitution, and the rest of the statute will be held valid and binding. 6 Howard, (Miss.) 625; *Fisher* v. *McGirr*, 1 Gray, 1; Livingston's Law Mag., September, 1855, 548.

Suppose section 18 of the Iowa liquor law (which provides for a submission to the people), be held unconstitutional, yet under section 27 of article 3d of the constitution, and section 22 of the "Code," the residue of the law went into force and effect on the 1st day of July, 1855. If a majority of votes had been cast against the law, we see no reason why it would not, like all other general laws, have taken effect on the 1st of July. Section 23d of the Code, provides for the taking effect of statutes, depending on a *future contingency*. Whoever thought that this section of the Code

was, therefore, not constitutional? This objection proceeds upon the assumption, that the legislature *have delegated* the law-making power to *the people*, in the passage of the Iowa liquor law. How? in what respect? surpasses our ingenuity to divine. But this may be truly styled, a constitutional age; a Young America era. Constitutional questions are not now left to the determination of an enlightened judiciary, but their province has been invaded, and their jurisdiction almost.ousted, by political conventions—by men who lean against lamp-posts for support, and by beardless boys in their teens, all.of whom *learnedly* (?) discuss, and dogmatically pronounce on, the constitutional obligation of laws. This disposes of the 1st and 2d errors assigned. The third error assigned is, " That the law presumes the guilt of the defendant, before he has been proved guilty by competent proof." Section 5th relates to, and prohibits the manufacture of the prohibited intoxicating liquor, and contains no provision as to evidence or presumption of law. Section 6th relates to, and prohibits the sale of, intoxicating liquor, and contains nothing upon which to base this assignment of error. This objection, then, must relate to the 7th section, which provides " that upon the trial of every indictment or information for violations of the provisions of this section, proof of the finding of the liquor named, &c., *except* in the private dwelling-house of the defendant, shall be received and acted upon by the court, as *presumptive* evidence that said liquor was kept or held for sale, contrary to law."

And in section 8 it is provided, that proof of the manufacture, sale, or keeping with intent to sell, contrary to law, by the accused, in or upon the premises described, shall be deemed sufficient *presumptive evidence* of the offence provided for in this section. These provisions do not support the error complained of above, viz: that the law presumes the guilt of the defendant before proof, inasmuch as these sections expressly require proof of certain *facts*, and when proved, the law only raises and declares a presumption which naturally arises from, and attaches to, a certain state

of facts which have been established by proof. Such provisions are usual and common. See Code, § 926.

We deny that this law *presumes* the guilt of the accused, without *proof*, or that it changes the rules of evidence; on the contrary, the accused, by explicit provision, is to be regularly informed against, or indicted; he has his day in court; his plea of not guilty, puts the state upon full and plenary proof, before a jury of his fellows; and he has the express right of appeal, without any unusual limitation or restriction. But suppose the act does change the rules of evidence, or prescribes and creates new rules of evidence, yet these are confessedly within legislative competency. Code, §§ 2921, 2927, 2624, and 2643; 1 U. S. Stat. at large, 677; 1 Cond. Repts. 593; 16 Peters, 342; 1 Greenl. Ev. § 33; Arch Crim. Plead. and Ev. 124.

The 4th assignment of error is, that "this law violates that provision of the constitution, which provides that every defendant charged with the commission of a crime, shall have the charges fully and distinctly specified, and presented against him." We are not aware of any such provision of the constitution, but presume reference is had to section 10 of the bill of rights, which merely provides, that "the accused shall have a right to be informed of the accusation against him." There is nothing in the liquor law which attempts to deprive a defendant of this common law and constitutional right; but, on the contrary, this law expressly declares, that the accused shall, in all cases, be tried on an *information*, on oath, regularly filed, or an *indictment* regularly presented. We discover nothing unusual in section 13 of the law, and without saying more on a matter so plain, we refer to the following analogous provisions of the Code of Iowa. Code, §§ 2624, 2643, and 2921–2927.

The next error complained of is, that this law is in direct violation of the 1st section of the bill of rights, which declares, that "all men have a right to acquire and protect property," and "that this law provides for the destruction of property, without notifying the owner thereof, or making it necessary that he should be notified." How does the law

interfere with the "right to acquire and protect property?" It does not do so. Does the defendant in this case contend, that the legislature does not possess the power, to declare that *certain* property kept for certain purposes, is illegally kept; and that being so kept, it is noxious to the public, and *de facto* a nuisance, and is subject to be abated and destroyed? All governments have the power to prohibit the use of property, under certain circumstances, for certain purposes, and of declaring it a nuisance, and abating and destroying the same as such. See brief of attorney-general; also, see Code, § 2726, which provides for the *destruction* and *forfeiture* of adulterated food and liquor. Also, section 2728, as to forfeiture and destruction of adulterated drugs and medicines; and section 2760, prohibiting the manufacture of gunpowder within eighty rods of any other building, and if so manufactured, subjecting the person to criminal prosecution, and the building to destruction as a nuisance. And by section 2761, houses of ill-fame, gambling-houses, and houses where drunkenness, &c., are carried on, are nuisances, and may be abated and destroyed.

What difference is there, in principle, between section 2725 *et seq.*, of the Code, and the Iowa liquor law, as regards property, in prohibited intoxicating liquors? None at all. See Code, § 2735. Similar provisions may be found in the laws of every state in the Union, providing for the *forfeiture and destruction of property*, under certain circumstances. Among others, *vide* Mississippi Code, 945; Virginia Code, chap. 28, 210; Revised Stat. Mass. 743; Revised Stat. Wis. chap. 140, 711. The whole doctrine is fully discussed and settled, 5 Howard (U. S.), 504. There is no force or truth in the objection, that the law provides for the destruction of property, without notifying the owner thereof, &c. The proceeding against the liquors, sections 9 and 10, are merely proceedings *in rem*, and section 10 expressly requires notice, and prescribes the manner in which it shall be given. The citation of this section is a full answer to this objection; and at the time and place of trial, any person claiming an interest in the liquor and vessels, may appear and defend.

The issue to be tried, the judgment to be rendered, and the whole proceedings, show that the entire matter is a proceeding *in rem;* and though judgment may be rendered for costs against a party who voluntarily defends, yet this judgment is collectable only by execution, as in civil cases, and not by imprisonment.

The next constitutional objection is, that ·"The Iowa liquor law violates that provision of the constitution, which declares 'that the right of the people to be secure in their houses and effects against unreasonable search, shall not be violated.'" That this objection is far-fetched and untenable, requires no argument to demonstrate. A glance at section 9, will show at once its groundlessness and futility. The law could not well be devised, which would more carefully guard the rights of the citizen in this respect. The liquor law is much more rigid and particular, than the general law, on this subject, as contained in the 27th chapter of the Code, and more so than any law we have ever seen on the subject of searches and search warrants. The Massachusetts law did not "require the complainants to state, either as a fact or belief, that the defendant, or any person designated, has kept, or is keeping, liquor for sale contrary to law." The Iowa law does require this. And without further specification, the court will find that the Iowa law, *is not obnoxious to a single objection* which the Supreme Court of Massachusetts, in *Fisher* v. *McGirr*, urged against the search and seizure provision in their law; but on the contrary, our law seems to have been carefully framed to purposely avoid the objections of C. J. SHAW, in the case referred to.

The next objection to the law is this, "That it violates the constitution, for that it confers jurisdiction upon justices of the peace to adjudicate upon, and render final judgment upon, an unlimited amount of property." There is no basis for this objection. *What* section of *what* article does this law violate, on this subject? Can it be found? We have never seen it, and are unable to find it. Nor have we ever been able to find any section of the liquor law, giving justices

of the peace power to render final judgment; on the contrary, in all cases arising under this law, an express appeal is allowed, and justices of the peace have no exclusive jurisdiction, and cannot pronounce any conclusive and final judgment.

The next objection is, "That this law authorizes the abatement and destruction of property, both real and personal, upon the mere fact that the liquor is found on the premises, without any other proof." This complaint against the law, is as groundless as the last. The law does not authorize any such thing. A recurrence to the law, to see what it does require in this respect, and this objection stands refuted. We dismiss it, therefore, without further argument. The next assignment of error is, "That the court erred in excluding the record of a former conviction, offered in evidence by the defendant, under his plea of *autre fois convict.*" We very much doubt whether this point will be seriously urged in this court, but having been made, we will say a few words in reference to it, and but few words are required to show that it is not well taken. The plea of *autre fois convict* was filed in the case of "*The State* v. *Certain Intoxicating Liquors, and Cephas Sanders, who claims to be the owner thereof.*" The information and whole proceedings in the case, were based upon sections 9 and 10 of the liquor law. Under section 10, Cephas Sanders came into court, and claiming an interest in said liquor, he filed his written plea, that the said liquor claimed by him, was not owned or kept with intent to be sold, contrary to the law, &c. "Cephas" himself, had been before convicted under section 7, and judgment *in persona* had been rendered against him, pursuant to the provisions of that section. And in the proceedings under sections 9 and 10 against certain liquor, &c., Cephas, who voluntarily appeared to defend for the liquor, offers in evidence, as a bar under the plea of former conviction, the record of his *own* prior *personal* conviction under section 7. This the court below excluded, and the exclusion was proper; for although he had been *personally* convicted for a violation of section 7, in owning and keeping intoxicating liquor, with intent to

sell the same, contrary to law, yet that does not bar the state from proceeding against the *liquor itself*, under sections 9 and 10. Suppose A. has been convicted under section 5, of a charge of unlawfully manufacturing intoxicating liquor, does that bar the state from proceeding against such manufactured liquor, and on the proper charge and proof, prevent such liquor from being adjudged forfeited? On the other hand, if liquor is, on the proper charge and proof, declared forfeited, does this *bar* a proceeding against the *manufacturer* under section 5, for a violation of that provision, and can a man plead a judgment of forfeiture under sections 9 and 10, against the *liquors*, in bar of a prosecution against *himself*, for illegal *manufacture* or sale. Is his *liquor* and *himself* identical, one and the same? Are they, as Webster said of Liberty and Union, "one and inseparable?" Looking at the object and intent of the law, the position seems to us to be the climax of absurdity.

According to the doctrine of the defendant, if you proceed against the liquor, you are debarred from proceeding against the *seller* or *manufacturer*, and *vice versa*—a construction which would completely defeat the intent, policy, and effectiveness of the law. The offence created by section 7, is not the same; nor does it embrace the offence provided for in section 9; and therefore, a conviction or acquittal of one, is not a bar to a prosecution for the other. *State* v. *Brown*, 16 Conn. 54; Archbold's C. P. 82; *People* v. *Barrett*, 1 Johns. 66; *Commonwealth* v. *Cunningham*, 13 Mass. 245; *Gerard* v. *People*, 3 Scam. 363. It is certainly an unusual proceeding, to plead a *personal conviction* in bar of a proceeding *in rem*, or *vice versa*.

The other errors assigned, it is not necessary to notice, as the court will see from the record, that they are not well taken. In conclusion, permit us to say, that we are glad these important questions are to be adjudicated by an impartial and intelligent tribunal, and one that will not, on imaginary grounds, or for slight reasons, nullify and strike down a solemn act of the legislature, which has received the

express sanction, and emphatic approval, of a large majority of the electors of the state.

*Platt Smith*, for the plaintiff in error.

This case involves the question of the constitutionality of the liquor law. The first point to which we call the attention of the court is, that the so-called act, is not an act of the legislature; it is not a law. The constitution of Iowa, (art. 3, sec. 1,) divides the government of Iowa into three separate parts: "the legislative, the executive, and the judicial." The legislative department is charged with the duty of making the laws. The old maxim, *delegatus non potest delegare*, applies with full force. Neither of these departments can transfer or delegate its authority or function to the other, or to any other person. Thus it has been decided by this court, in the case of *Foley* v. *Carson*, at the June term, 1854, that section 1797 of the Code, providing that the court, by consent of parties, may select a person to act as judge in a particular case, is unconstitutional and void, and that a judgment rendered by a person, who was duly selected by the court and the parties, was null and void, on the ground that the judicial power of the state was vested by the constitution, in judges to be elected according to the provisions of the constitution; hence, it was not in the power of the legislative department, to authorize " the court, with the consent of parties," to delegate this power to another person.

So, with the legislative department; those acts which the constitution requires the legislature to do, cannot be done by proxy; the power cannot be transferred or delegated to any other department or person. Section 27 of the 3d article of the constitution provides: "If the General Assembly shall deem any law of immediate importance, they may provide that the same shall take effect by publication in newspapers in the state." The legislature, at the last session, undertook to delegate this authority to the governor, and provided, by express act, that when the "governor shall deem it necessary," he may cause the laws to be published in a newspaper, and that the laws thus published, should

take effect, &c. See acts of 1855, page 69. This court, at the June term, 1855, held said act unconstitutional. *Scott v. Clark et al.*, 1 Iowa, 70. The court, in speaking of the power of the legislature to delegate this power to the governor, says: "It cannot constitutionally be conferred upon the governor, or any other person." In the present case, the legislature, instead of making, publishing, and distributing the law, as the constitution provides, merely proposed a law to the people, and provided that " the question of prohibiting the sale and manufacture of intoxicating liquor, shall be submitted to the legal voters of the state." The state canvassers, immediately after the election returns are made, shall make and *publish* an official statement of said vote; and if it shall appear from such official statement, that a majority of the votes cast as aforesaid, upon said question of prohibition, shall be for the prohibitory liquor law, then this act shall take effect on the first day of July, 1855." The act further provides, that "those portions of this act having relation to the election provided for in this section, shall take effect from and after its publication in the Iowa Capital Reporter, and the Iowa Republican." One portion is to become a law, when published in these newspapers; but this is confined to the portion contained in the section providing for the election. What event will give vitality to the remainder of the act? Is it a publication of any kind? No! That depends on several events; one is, that a majority of the votes are cast for prohibition; then, after the return is made, the canvassers are to *publish the vote*, not the law; and the act is to take effect on the first of July, if the majority of the votes are for prohibition; not otherwise. The legislature, instead of making the law themselves, delegate the power to the people, "submit the question of prohibition to the voters;" they neither make the law, nor provide for, nor authorize its publication. It may be contended, that, as the act was published in the Reporter and Republican, that it did take effect, but the act in terms forbids this construction; it is only one section that is thus to take effect. It makes the balance of the act take effect

on the contingency, that it shall appear from the publication of the canvassers, that the prohibition vote was the majority. The constitution recognizes no such contingency, no such power. The constitution (article 3, section 27) provides, that "no law of the General Assembly, of a public nature, shall take effect, until the same be published and circulated in the several counties of this state, by authority." This act is a much wider departure from the constitution, than the act declared unconstitutional, at the last term, above referred to. In that case, the governor was to publish the laws; but in this case, part of the act is to take effect by publication, and the other part, by a publication of the vote. The legislature, in the one case, undertake to make the laws themselves, and let out the job of publication to the governor; in the other, they let out the job of making the law to the people, and publish a part of the act; and as to the remainder, they dispense with the constitutional provision for publishing and circulating in the several counties in the state, by authority, and provide a new substitute in its stead. The act is not silent; it speaks for itself; it shows when and how it is to be made, and when and how it is to take effect. The substitute they had no more power to adopt, than to provide that the governor, at his discretion, might publish the laws. They had no more right to delegate the authority in the one case, or to deviate from the constitutional mode of making the laws in the other, than the makers of the Code had, to authorize the District Court, with the consent of parties, to appoint a special judge for the trial of a particular case.

The practice of submitting laws to a vote of the people, has been repeatedly declared unconstitutional, by several of the most respectable courts in the Union. *Rice* v. *Foster*, 4 Harrington (Delaware), 477; *Parker* v. *The Commonwealth*, 6 Barr, 509; *Barto* v. *Himrod et al.*, 4 Selden, 483. In the latter case, the Court of Appeals of New York, declared the school law unconstitutional, for the reason that it was submitted to a vote of the people, and that the legislature had not the power to delegate their authority in this manner. The Supreme Court of New York had, on several occasions

Sanders v. The State of Iowa.

before, made a similar decision, but the decision of the Court of Appeals, being that of the highest court in the state, is conclusive on the subject. Suppose the governor should undertake to delegate the pardoning power to a notary public; or that the Supreme Court should authorize a justice of the peace, or three justices, to hold the Supreme Court; or suppose the District Court should authorize a vote of the people of the county to be taken in a chancery or a murder case, and should direct the clerk to enter judgment, to take effect on the first day of July, provided that the canvassers should publish the vote, and a majority of the people should find the defendant guilty, or in the chancery case, should decree for the complainant. Would not every lawyer be shocked? Who would have any confidence, or feel any security? Where would our notions of constitutional law be then? What use for a constitution? Governors, legislators, and judges are selected because of their learning, ability, and responsibility to those whom they serve. They can neither of them dodge, shirk from, or shift the responsibility, in whole, or in part, upon anybody else.

An act of the legislature, is an entire thing: as such, it should have one object and one publication, and should take effect at the same time in all of its parts. One part cannot be made and published by the legislature in the usual way, and another part left to the people, the voters, and canvassers, &c. The old maxim, that too many cooks spoil the broth, is rather homely, but is quite applicable in this case. If a man should employ a surgeon to amputate a limb, such surgeon would have no right, after the job was partly done, to let out the balance to a butcher. The constitution provides that a person accused of an offence, shall have the assistance of *counsel;* in such a case, the court could not appoint a doctor or a preacher to defend the criminal, instead of *counsel* learned in the law. The entire law should be the workmanship of one hand; the legislature should attend to its own business. The members are selected on account of, and paid for, their skill. They cannot receive two dollars a day, and let out the work to irresponsible jour-

neymen, who get nothing, and have no skill or knowledge of the business,—many of whom would be voting a law into existence, which they could not read in print.

The defendant is held to answer for selling in violation of the law, and his liquors have been seized and destroyed; consequently, the selling and seizure clauses are necessarily involved in the case; and, first, we will proceed to examine the seizure clause. Section 9 provides for a justice of the peace issuing a warrant, upon the information of three residents of the county, for the seizure of liquor. The information is not to be upon the knowledge of the informants, but on their belief, " that any intoxicating liquor, described as particularly as may be in said information, is in said county, in any place, described as particularly as may be in said information, owned or kept by any person named or described in said information, as particularly as may be." Upon the filing of the information, the justice is to issue a warrant, " directed to any peace officer in said county, describing, as particularly as may be, the liquor, and the place described in said information, and the person named or described in said information as the owner or keeper of said liquor, and commanding said officer to search thoroughly said place, and to seize the said liquor, with the vessel containing it, and to keep the same securely until final action be had thereon." Section 8 of the first article of the constitution of Iowa, provides, that " the right of the people to be secure in their persons, houses, papers, and effects, against unwarrantable seizures and searches, shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the papers and things to be seized."

Now, the above section of the liquor law, clearly violates this provision of the bill of rights. The bill of rights requires that the thing to be seized, and the place to be searched, be particularly described; whereas the act only requires that they be as particularly described as may be, meaning that the persons may give such information as they have. It is not required by the law, that it shall ap-

pear that the amount or value of the liquor shall be within the jurisdiction of the justice of the peace; nor is it necessary that the warrant should name the person who is the owner, or whose premises are to be searched, but it may either name him, or describe him, as particularly as may be, or it may describe the keeper of the liquor,—the law is in the alternative; consequently, the person making the complaint, and the justice who issues the warrant, may, at their option, name the person who is the owner, or they may describe him, or they may describe him as particularly as may be, saying that they have no particular means of describing him. Or, if they do not choose to do this, they may name, describe, or excuse themselves from describing, and say they describe as particularly as may be, the person who is the keeper, and omit the owner altogether, even though he might be well known to all parties. There are no alternatives or may-bes in the constitution; but its language is,— " And no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the papers and things to be seized," a positive command that it shall not be issued upon any pretence, apology, or excuse, for want of a description, but the place and thing shall be particularly described.

The eleventh article of the constitution of Iowa, section 1, limits the jurisdiction of justices of the peace, to one hundred dollars. The liquor law authorizes the seizure of liquor to an indefinite amount, and the justice is authorized, without notifying the owner, by merely posting up a notice at the place where it was seized, to pronounce judgment of forfeiture, and to issue an execution, commanding the officer to destroy liquor to any amount. Let us suppose a practical case under this law: A warehouseman, in Davenport or Dubuque, might receive a cargo of liquors, shipped from New York to Minnesota. These liquors might be owned by twenty or fifty different merchants, county agents, &c., of Minnesota, and may be of the value of fifteen or twenty thousand dollars. Some three individuals in the community, who have an appetite for destroying liquor, file an informa-

tion before a justice of the peace, describing the keeper of the liquors, as the law calls him, as particularly as may be; not knowing much about him, however.  The justice issues his warrant, describing him, in the same manner; the liquors are seized; and the next step, by the express terms of the act, contained in section 10, is, that the justice "shall within forty-eight hours after such seizure, cause to be left at the place where said liquor was seized, if said place be a dwelling-house, store, or shop, posted in some conspicuous place on or about said buildings, and also to be left with, or at the last known and usual place of residence of the person named or described in said information, as the owner or keeper of said liquor, if he be a resident of this state, a notice summoning such person, and all others whom it may concern, to appear before said justice, at a place and time named in said notice (which time shall not be less than five, nor more than fifteen, days after the posting and leaving of said notices), and show cause, if any they have, why said liquor, together with the vessel in which the same is contained, should not be forfeited."  The court will perceive, that this is not required in such a case as we have supposed, that is, where the owners or the keepers should happen to be non-residents of the state; nor is any notice required to be posted up, unless the place is a store or dwelling-house, or shop; if they should be found in a warehouse, or a steamboat, or upon the levee, or in a railroad car, no notice whatever is required, of any kind, to any person, nor any pretence of notice.

Section 10, further provides, "that whether any person shall so appear or not, said justice shall, at the prescribed time, proceed to the trial of said case, and said complainants, or either of them, may, and upon their default, the officer having such liquor in custody shall, appear before said justice, and prosecute said information, and show cause why such liquor should be adjudged forfeited."  It will be seen by this, that the justice may, without any notice whatever, or by merely constructive notice, if the liquor should be found in a dwelling-house, store, or shop, proceed in the trial; and

that the accusers may appear or not, as may best suit them. It entirely deprives the defendant of the opportunity of being confronted with the witnesses against him, as provided in the tenth section of the article of the bill of rights. The same section authorizes the justice to pronounce judgment that the said liquors be forfeited. Section 11, provides, that " whenever it shall be finally decided that liquor seized as aforesaid, is forfeited, the justice of the peace, or other court rendering final judgment of forfeiture, shall issue to the officer having said liquor in custody, or to some other peace officer, a written order, directing him forthwith to destroy said liquor, and the vessels containing the same; and immediately thereafter to make return of said order to the court whence issued, with his doings indorsed thereon, which return shall in all cases be sworn to." Here is a judgment entered against a man in his absence. Probably the property of twenty men would be destroyed, who live in another state, without their knowledge or consent, and without even a constructive notice; for no such notice is required, unless the liquor be found in a dwelling-house, store, or shop, and even then, it would only be a constructive notice, by posting. The persons, as owners or as keepers of the liquor—the liquor to be seized—and the place where it is to be seized—need not be particularly described; but the owner may be named, or the keeper may be named, or either of them may be described, if they can be; and if they cannot be particularly described, as the constitution requires, then they may be described, either of them, as particularly as may be; and even though they are described, no notice of any kind is necessary, unless the liquor be found within a house, store, or shop. The mode of destroying the liquor, is not particularly specified, but the practical mode of destroying it, it is presumed, would not be unusual, nor would it be a departure from wonted custom. In most cases, it would probably be made to flow in the customary channels, unless some of it should be diverted for mechanical or medicinal purposes. But it may be said, that all this cannot be done, without some proof. But we ask, where the party has no notice, and where

no notice is required, has the defendant an opportunity of being confronted with the witnesses who may swear? Are the accusers required to be present? They certainly are not. If neither they, nor either of them appear, the act provides that the officer shall prosecute, and if any swearing were necessary, he could do it himself.

Section 7 provides: "And upon the trial of every indictment or information for violations of the provisions of this section, proof of the finding of the liquor named in the indictment or information, in the possession of the accused, in any place, except his private dwelling-house, or its dependencies (or in such dwelling-house or dependencies, if the same be a tavern, public eating-house, grocery, or other place of public resort), shall be received and acted upon by the court, as presumptive evidence that such liquor was kept or held for sale, contrary to the provisions of this act." Here, then, is a plain direction of the statute, that the bare finding of liquor in any place, except in a dwelling-house or its dependencies, shall be evidence of an intent to violate the act; consequently, all the officer would have to do, would be to swear that he found the liquors, and *that* would be presumptive evidence of guilt. No proof is required of the intent to sell. If a man should go to the county agent, and should buy liquor for mechanical or medicinal purposes, and an officer should seize it in his wagon, while it was standing in the street, and the owner was attending to his business in town, the finding in the wagon, would be evidence that he intended to sell it, in violation of the act. Or, if he kept a boarding-house, or a tavern, or an eating-house, the bare fact of finding liquor, no matter in how small a quantity, would be evidence that he intended to sell it, in violation of the act. If the owner should happen to be absent from home, or should be sick, or should not happen to see the notice that was posted up; or if it should be found in any place except his house, no notice would be necessary; a judgment of forfeiture might be pronounced against liquors bought and kept for medicinal or mechanical purposes.

An officer would have a right to go into a church, for a

church is not a dwelling-house, and seize upon liquors found in the church, although they might be intended for sacramental purposes.    Or the officer might go into a shop, where they were kept and intended for mechanical purposes only. If a man keeps a boarding-house or a tavern, he cannot have enough of the article in his house to replenish his camphor, without subjecting his house to be declared a nuisance, and not only subjecting his house to be demolished, but the ground on which it stands.    The eighth section provides, that, "in case of violation of the provisions of either of the three preceding sections, the building or erection of whatever kind, or the ground itself, in or upon which such unlawful sale or manufacture, or keeping with intent to sell, of any intoxicating liquor, is carried on, or continued, or exists, is hereby declared a nuisance, and may be abated as the law provides."    We think this is a most extraordinary law; it goes entirely beyond all the other liquor laws.    The furious, unheard of consequences, which are to be visited in the shape of fines, upon the defendant himself; the destruction of his houses, and even the ground upon which they stand; the forfeiture of his liquor; he to be branded as a criminal, to be outlawed, and tried without any notice or hearing, as he may be under the provisions of this act; the vesting of justices of the peace with jurisdiction to an unlimited amount of property in value, with power to destroy, to declare forfeited, &c.; are all entirely unprecedented, and without any warrant of authority, under the constitution of Iowa.    It is not very hard to imagine how a constable, attended by a *posse comitatus*, might destroy a few barrels of good liquor; nor would it be very difficult to imagine how they might go to work, after they had destroyed a sufficient quantity of the liquor, and destroy the house; but when it comes to abating the ground, we cannot conceive how this could be done, unless it might be considered as constructively done, as land and real property could have no value in a country, where such ridiculous proceedings were allowed, and such an utter and total disregard of property sanctioned.    A regular trial, such as is contemplated by the constitution, means that a

party shall be entitled to the presumption of being innocent, until he is proved to be guilty, according to the time-honored and immemorial usages of the common law; and a statute which completely overturns this principle, is a plain violation of the constitution. "Due process of law," means a regular trial throughout.

This act goes beyond all other similar laws, in nearly all of its provisions. Other liquor laws provide that "pure wine may be sold for sacramental purposes;" but our act provides for the appointment of an agent or agents of each county, for the purchase of *intoxicating liquor*, and for the sale thereof within such county, for medicinal, mechanical, and *sacramental* purposes only. It is "intoxicating liquor" —that which will really "make drunk"—which is to be used for sacramental purposes. This has been interpreted by some of the county agents, to mean whiskey, which is supposed to be about as "intoxicating" as any other liquor. This provision, together with the provision concerning the abatement of the ground, and the proceeding against persons, without any notice; the provision for describing persons and things, only as particularly as may be, instead of describing them as the constitution directs; the provision making the bare finding in any place, except a dwelling-house, evidence of an intent to sell—all concur in stamping the act as being anything but the work of wise legislators.

Story on the Constitution (second edition), 1901, states the provisions of the constitution against unreasonable searches and seizures. In section 1902, referring to that provision, he says: "This provision seems indispensable to the free enjoyment of the rights of personal security, personal liberty, and private property. It is little more than the affirmance of a great constitutional doctrine of the common law. And its introduction into the amendments, was doubtless occasioned by the strong sensibility excited, both in England and America, upon the subject of general warrants, almost upon the eve of the American Revolution." He then goes on to show the history and cause of general warrants, instead of special warrants, particularly and specifically de-

scribing the persons and things to be seized; that a contrary practice had been indulged in; general warrants had been issued; and he adds: "The general warrant, so issued, in general terms authorized the officers to apprehend all persons suspected, without naming or describing any person in special. In the year 1763, the legality of these warrants was brought before the King's Bench for solemn discussion; and they were adjudged to be illegal and void for uncertainty." *Morey* v. *Leach*, 3 Burr. 1743. "A warrant, and the complaint on which the same is founded, to be legal, must not only state the name of the party, but also the time and place, and nature of the offence, with reasonable certainty." The learned author refers, in support of this doctrine, to *Ex parte Burford*, 3 Cranch, 447. Here is a plain history of the reason that gave rise to this clause against unreasonable searches and seizures. Such warrants were declared to be illegal, even in England. To prevent such warrants from ever being considered valid, this clause was inserted in the constitution of the United States, and of the respective states. The mischief was, that warrants were issued without particularly describing the person and thing to be seized; the constitutional safeguard was inserted to prevent this. Under the old practice, they only described persons and things, as particularly as may be; they either described the owner, or if they did not please to describe him, they described somebody else; and if they did not describe that somebody else, who was the keeper, then they described matters generally, or only as particular as may be. Justice Story considers this provision as a great safeguard, necessary for the protection of liberty and property.

That particular part of our law which applies to seizures, is in the same language, probably *verbatim*, as the ninth section of the Massachusetts liquor law. Ch. J. SHAW, in his opinion in the case of *Fish* v. *McGirr et al.*, 1 Gray, 1, sets forth the provisions of the Massachusetts law, and the different extracts which he gives, when put together, make precisely the ninth section of our act. The chief justice pronounces the act to be unconstitutional, for the reasons that

it provides for no sufficient notice—it gives the justice juris-
diction over an unlimited amount of property—and the per-
son, and thing to be seized, are not to be particularly de-
scribed, or at any rate, it is not necessary they should be
particularly described.   In the particular case before that
court, the difficulties had been obviated by the justice nam-
ing a person in his warrant, and by giving regular notice to
the party; but it was the unanimous opinion of the whole
court, that the act was unconstitutional and void; and that
an unconstitutional and void act, could not be patched up
and made valid by a justice.   They would look at the act,
and see whether on its face, it was valid; and if the law did
not require the justice to particularly describe and name the
person and thing to be seized, and if it did not require a
notice, the law would be unconstitutional, though the just-
ice should patch it up, and give names, notices, &c.   The
proceeding, the warrant, the complaint, are the superstructure,
and the law is the basis.   If this basis is unsound, as a mat-
ter of course, the superstructure cannot be secure; if the
basis is void and unconstitutional, the superstructure is a
nullity; and it matters not how artfully and exactly the pro-
ceeding may be framed, it must rest upon a constitutional
law to be valid.   Ch. J. SHAW says: "It appears to us,
therefore, that this act, in terms, warrants and requires un-
reasonable searches and seizures, and is, therefore, contrary
to the constitution.   If it be said, that the act provides for as
much certainty in the description of the articles to be searched
for and seized, and in the description and limitation of the
officer's power, as the nature of the case will admit of; that
the complainants cannot know with certainty, before the
search is made, that spirits are deposited in the place de-
scribed, or are intended for sale, and can only state their
belief; that neither the complainants, nor the magistrate,
can know, before search, who is the owner, or has the cus-
tody, or intends to sell, and, therefore, cannot name him;
and that it is impossible for the complainants, or for the
searching officer, to distinguish what part of the liquors found
is intended for sale, and that, must be a subject of inquiry

before the magistrate afterwards; the answer seems to us to be obvious, that if these modes of accomplishing a laudable purpose, and of carrying into effect a good and wholesome law, cannot be pursued without a violation of the constitution, they cannot be pursued at all, and other means must be devised, not open to such objections."

Again: under our law, or the Massachusetts one, which, in this respect, is precisely like it, imported liquors, which are expressly protected by the act of Congress in the transit to the point of destination, might be seized. For instance, a cargo of imported liquors might be deposited in a warehouse in Iowa, for reshipment to St. Paul, where the importer resides; or if you please, to an importer who resides in Iowa, and who has a perfect right, under the laws of Congress, to buy these liquors. While the cargo remained in the warehouse, any three persons might make complaint, not that there were such liquors there, but that they believed there were, and cause the same to be seized. For this cause, the Supreme Court of Massachusetts held the law to be unconstitutional; they say: " Another ground is, that if, upon a complaint that some liquors are kept in a warehouse or on board a vessel, believed to be intended for sale, a warrant shall go, and the officer is obliged to seize all the liquors found in the same store or vessel—and such is the plain direction of the statute—then the officers must seize such liquors, though imported, and remaining in the original packages, (a cargo of wine and brandy, for instance,) and bring them before a magistrate. This would be an interference with the regulation of foreign commerce, placed under the exclusive jurisdiction of the constitution and laws of the United States. And though there is a provision in this act, that the owner of such imported liquors may go before the magistrate and obtain their release, by proof of the facts, yet such seizure and detention, perhaps for a long period, would be in danger of bringing this power into conflict with the laws of the United States, which, within their proper sphere, are the supreme law of the land."

The court, after enumerating four constitutional objec-

tions, either one of which made the seizure part of the act entirely null and void, proceeded as follows: "Another ground, upon which we are of opinion, that this section of the act is unconstitutional, is, that in the commencement and course of proceedings, required and directed by the series of measures provided for in the act, many of the precautions and safeguards for the security of persons and property, and the most valuable rights of the subjects, so sedulously required and insisted on in the laws of all well ordered governments, and especially prescribed as the governing rule of the legislature, in our declaration of rights, are overlooked and disregarded." Then the chief justice quotes from the bill of rights of Massachusetts, as follows: "All men have certain natural, essential, and inalienable rights, among others, that of acquiring, possessing, and protecting property." He proceeds to discuss the meaning of this section of the bill of rights, and shows clearly, that such a law prevents a man from acquiring, possessing, and protecting his property, and is consequently null and void. The same provision *verbatim*, is found in the bill of rights of the constitution of Iowa. As a matter of history, we all know that Massachusetts was the first state that adopted a constitution with a bill of rights; and that these bills of rights, wherever they have been adopted in other states, have generally been copied from Massachusetts. The very first words in the bill of rights of the constitution of Massachusetts, declare that all men are born free and equal. That constitution was adopted before the constitution of the United States was adopted, and immediately after the revolution, and it yet remains the constitution of Massachusetts, with very few amendments. Shortly after the adoption of this constitution, the question arose in Massachusetts, whether slavery could exist, compatible with this declaration of the bill of rights, and the Supreme Court decided that it could not. The consequence was, that when the federal convention met to adopt the constitution of the United States, everything that had the slightest squinting towards a bill of rights, was looked upon with great suspicion, and the constitution, as

adopted, contained no bill of rights. The constitution of the United States, therefore, is not as broad in its terms as most of the state constitutions. The first constitution of Massachusetts that was proposed, was proposed without a bill of rights, and was voted down, because it had none. See 3 Hildreth's History of the U. S., 375 and 391. At that time, the right to drink tea, the right to drink and to sell whiskey, the right of every man to enjoy his own opinions with regard to religious matters, were deemed among the most sacred rights. Liquors of all kinds had been an article of commerce, and used, and recognized as property, long before. The date of this right, was coeval with the history of the common law. See Jacob's Law Dictionary, title Wine.

Shortly after the adoption of the constitution of Massachusetts, Shae's rebellion broke out, and the government of the United States was compelled to interfere, and send an army to put it down. The rebels were dealt with by the local authorities, and disfranchised; "they took from them the right to vote, to be jurymen, schoolmasters, innkeepers, or the retailers of spirituous liquors." 3 Hildreth's Hist. of U. S., 476. This shows that a man who was to be deprived of the privilege of selling liquors, was to be considered as disfranchised; it was a punishment to be visited upon rebels, for raising a rebellion against their country. Who will undertake to say now, that the whole community shall be considered as rebels? That they will take from them, not only the privilege of being retailers of spirituous liquors, but shall take from them the privilege of acquiring it, of possessing, of protecting it, or of using it. This clause in the bill of rights, in relation to acquiring, possessing, and protecting property, had reference to property as it then existed. In fact, there are more than twenty decisions, promulgated within the last three years, which pronounce liquor to be property. It was, at the time of the adoption of the constitution of Iowa, Massachusetts, and the other states, considered such. The star of temperance had not, at that time, dawned upon the people; although in the constitution of

Massachusetts, temperance is recognized as a fundamental virtue. The theory in those days was, that the people were allowed to practice temperance, and this was allowed as a privilege. The theory now is, that instead of being allowed to practice temperance, they are to be prohibited from it; and abstinence, teetotal, is substituted in its stead. The right to acquire, to possess, or to protect, is to be taken away. Hamilton and Madison, in the Federalist, in speaking of the ways and means of the government to raise revenue, speak of duties being levied on spirituous liquors, as being on a kind of property that might be made subject to such imports; but nobody dreamed, at that time, of such a thing as prohibiting a man from acquiring, possessing, or protecting it. Congress, at a very early day, did lay a duty upon whiskey, which caused one of the most formidable rebellions that was ever known in the Union; which was general in western Pennsylvania; and caused a great deal of bloodshed, and the destruction of vast quantities of property. Houses and barns, and stills, were burned down and destroyed; and the United States were compelled, not only to modify the law again and again, but in the end, to call out the powers of the United States to put down the rebellion. We are not aware that any attempt has since been made to levy a duty upon domestic liquors, by the United States. A full history of the rebellion may be found in the Western Annals, page 472 *et seq.* It appears upon that page, that Albert Gallatin, who was afterwards a very distinguished member of the cabinet of the United States—that the judges and members of the legislature of Pennsylvania, and the ministers of the gospel—all joined in with the people in raising this rebellion, and that Albert Gallatin actually presided at one of their meetings. The law was fiercely pronounced to be an invasion of the rights of the people. Now, we think that they were wrong, and that the United States had a right to levy a tax; but we refer to this, for the purpose of showing that in early days, liquor, like tea, was one of those things that was regarded as sacred; and even the

present liquor law, seems to regard whiskey as suitable for sacramental purposes.

Chief Justice SHAW, in his opinion, before referred to, speaking of liquor, calls it property in numerous passages, and as such, holds that it must be protected. This decision is a very able one; it was pronounced by five learned judges as the unanimous opinion of the court, which adds much to its value. The Supreme Court of Indiana, in the late case of *The State* v. *Beebee,* reported in the newspapers, had a question somewhat different from the question submitted in Massachusetts. It was, as to the constitutionality of that part of the law which creates the county agency, and that part which refers to the manufacture of liquor. The court say expressly, that they pronounce no opinion, either one way or the other, as to the seizure clause—that that is not before them. Three of the judges held, that the agency clause, and that clause which prohibited the making of liquor, were unconstitutional, null and void; and the defendant was discharged. The three judges who concurred in discharging the defendant, on account of the act being unconstitutional and void, arrived at their conclusion by somewhat different processes of reasoning; and the fourth judge entirely dissented, and held that the act, in all respects, was constitutional and valid. The opinion of Judge PERKINS is quite short, and to the point. We quote it nearly entire; and will also quote an extract from the opinion of Judge STUART, which opinion is very long.

Judge PERKINS says: "The law absolutely forbids the people of the state to manufacture and sell whiskey, ale, porter, and beer, as a beverage, or at all, except for the government, to be sold by it for medicine, &c., and it prohibits, absolutely, the use of all these articles by the people as a beverage. It is not competent for the government to monopolize the business of making and selling liquor as a medicine, since that is, and has been, a private pursuit of the people. This is not such a business that a private citizen cannot engage in. The maxim that '*The safety of the*

*people, is the supreme law*,' does not apply to our form of government, but written constitutions stand in its stead.

" It does not prove the power of the state legislature to enact the law in question, to show, that the Supreme Court of the United States has decided, that it cannot decide such state law inoperative; for that court can only decide void, such state laws as conflict with the restrictions placed upon state power by the constitution of the United States; and if, in that constitution, the states are not restrained from pass-ing laws in violation of the natural rights of citizens, the Supreme Court of the United States cannot act upon such laws when passed, because they do not fall within its juris-diction. But it does not follow, because the constitution of the United States does not prohibit state legislation infring-ing the natural rights of the citizen, such legislation is valid. The constitution of the United States may not, but that of the state may, inhibit it. The powers conferred on the legislature by our state constitution, have never been passed upon by the Supreme Court of the United States.

" By the first section of the first article of the state consti-tution, it is set forth that 'all men are endowed by their creator with certain inalienable rights, and that among those are life, liberty, and the pursuit of happiness.' The people have thus expressly reserved the right of property and its enjoyment, in forming their constitution, from the unlimited power of the legislature; and further, to guard the right, have declared that it shall not be taken from them, without just compensation, nor be injured without a remedy there-for by due process of law, nor be subject to unreasonable seizure, &c. Under these provisions, the legislature cannot take the property—the liquors of a single individual, if they are property—when not needed for public purposes, and then only, upon compensation; liquor is property; so are distilleries, in this state. They have always been held and taxed as property, and are of large value.

" Section 22, article 1, of the constitution, is as follows: ' The privilege of the debtor to enjoy the necessary comforts of life, shall be recognized by wholesome laws, exempting

a reasonable amount of property from seizure or sale, for the payment of any debt or liability hereafter contracted.' This constitutional provision would be of no avail, in case the property of the debtor consisted entirely of liquor, if the government could step in at will, and confiscate that property. This law also conflicts with another provision of the constitution, which declares that no law shall be passed impairing the obligation of contracts. The legislature cannot enlarge its power over property or pursuits, by declaring them nuisances, or by enacting a definition of a nuisance that will cover them. It is the province of the judiciary to ascertain and determine what nuisances are. Legislative discretion in the passage of laws, is a proper subject of the review and control of the judiciary, where constitutional provisions are infringed.

" The powers of Congress, under the constitution of the United States, and those of the legislature, under the state constitution, are not parallel, for in the constitution of the United States there is no bill of rights; nothing limiting Congress in its action as to commerce; while in the state constitution, there is a bill of rights, containing certain restrictions upon the legislative power, certain sections declaring rights in the citizen as against the government; and those restrictions operate just as potently upon the power of the legislature to regulate commerce, as to do anything else, and prevent that body just as effectually, from infringing the reserved rights by assumed regulations of commerce, as by any direct enactment. The court knows, and is capable of judicially asserting the fact, that the use of beer and liquor as a beverage, is not necessarily hurtful, any more than the use of lemonade or ice cream. It is their abuse, and not their use, that is hurtful. The legislature, in assuming that the manufacture and sale of these articles were not necessary to the community, and in acting upon that assumption, has unwarrantably invaded the right of private property, and its use as a beverage and article of traffic. For these reasons, the act is held to be void. The judgment should be reversed, and the prisoner discharged."

Judge STUART says : " It is proper to add, what was an-
nounced in the outset, that the details of the law, are not
before us ; and the opinion is not to be regarded as cover-
ing the search and seizure clause.   It is confined wholly to
the question before us—the power of the legislature to re-
strain the sale and use.   I am, therefore, of opinion, that it
was competent for the legislature to restrain the use and sale
of intoxicating liquor.   But that so much of the act as re-
lates to the manufacture and agency, are unconstitutional
and void ; but I do not put it on the ground assumed by
Judge PERKINS.   What the practical effect of this ruling
will be, it is not for me to say.   The intent with which the
liquor was sold in each particular case—whether incident to
the right to manufacture, or otherwise—will always be a
question for the jury.   It presents similar difficulties to those
in *Brown* v. *Maryland*, 12 Wheat. 419.   The court will
have to settle it on analogous principles.   The case of manu-
facturing, should be reversed, and Beebe discharged on the
merits."

It is proper to remark, that in this Indiana case, while
one of the counsel, Judge OTTO, was arguing, Judge STUART
stopped him, and reminded him, that the clause in the bill
of rights, declaring the inalienable right of acquiring, pos-
sessing, and protecting property, which was contained in the
constitution of 1816, had been omitted in the constitution
of 1851.   Thus showing that in Indiana, the constitution is
different from the constitutions of Massachusetts or Iowa ;
and Judge STUART, in delivering his opinion, makes an ex-
press reference to this difference.   Therefore, any reasoning
thrown out by any of the judges upon the prohibition
against selling, would not apply to the case now before the
court.

The particular fact in each case quoted, and the points
that were really before the court, should always be kept in
view, in the examination of decisions.   The cases referred
to in 5 Howard, 504, were not cases involving any question
in relation to prohibitory liquor laws.   They were license
questions, where persons had been selling without licences,

though licences might have been taken out. The only question in those cases was, whether the different. laws of these states, regulating the mode of licensing, were contrary to the acts of Congress for the regulation of commerce. The Supreme Court of the United States, under the 25th section of the judiciary act, have no jurisdiction to inquire whether state laws contravene the principles of the state constitutions; but that court is confined to the simple question, whether the particular act is contrary to the constitution of the United States, or the acts of Congress. See *Jackson* v. *Lamphere*, 3 Peters, 280; *McBride* v. *Hoey*, 11 Peters, 167. The Supreme Court of the United States, in this respect, is a court of limited jurisdiction. The object of the 25th section of the judiciary act, in allowing writs of error to the highest decision of a state court, wherein is drawn in question the validity of a state law, on the ground of its repugnance to the constitution of the United States, is to prevent the states from undermining the federal government, by passing laws which will contravene the constitution of the United States, treaties, or acts of Congress. When a case is made, it goes up specifically on the ground, that a certain clause of the constitution, or certain act of Congress under it, is violated; and the Supreme Court in its decision, is strictly confined to the particular point, and will make no inquiry as to any other. See *Pottards' Lessee* v. *Kibbe*, 14 Peters, 353; Law's United States Courts, &c. 123. Consequently, the only point involved in the cases in 5 Howard, was, whether the acts were contrary to the acts of Congress regulating commerce, and any dicta that the court may have thrown out beyond that, would go for nothing. When the court say that the states may pass laws having certain effects, without contravening the acts of Congress, they do not therefore undertake to say, that there might be nothing in the state constitutions which would prevent the passage of such laws; nor do they say, that if such a law as our law was passed, and the question should be raised, whether it was not a violation of the constitution of the United States, with regard to unlawful searches and seizures, that

they would declare that it was not. The state courts alone have power to declare laws unconstitutional, for the reason that they are opposed to the principles of the state constitutions. The Supreme Court of New York, at the July term, 1855, decided the liquor law of New York to be unconstitutional, in those provisions which prohibited the sale of liquors. Judge BROWN, who delivered the opinion of the court, maintained that liquor is property, in the fullest sense of the word, and that the legislature has no power to deprive it of the rights which appertain to property in general, and therefore no right to forbid its sale. Nor has it any right to interfere with the right of legal action for the protection of property, or deprive liquor of any of the defences with which the constitution surrounds private property, by declaring it a nuisance. He examines the various opinions given by the justices of the Supreme Court of the United States, to show that the right to import liquor, which is conferred by Congress, carries with it the right to sell; and infers that the legislature has no right to forbid the sale of liquors imported under United States laws.

He concludes: "I therefore arrive at the conclusion, that so much of the first section of the act under consideration, as declares that intoxicating liquors shall not be sold or kept for sale, or with intent to be sold, except by the persons and for the special uses mentioned in this act; so much of the sections 6, 7, 10, and 12, as provides for its seizure, for forfeiture and destruction; so much of the 16th section as declares that no person shall maintain an action, to recover the value of any liquor sold or kept by him, which shall be purchased, taken, detained, or injured, unless he proves the same was sold according to the provisions of the act, or was lawfully kept and owned by him; so much of section 17 as declares that upon the trial of any complaint under the act, proof of delivery shall be proof of sale, and proof of sale, shall be sufficient to sustain an averment of unlawful sale; and so much of section 25 as declares that intoxicating liquor, kept in violation of any provision of the act, shall be deemed to be a public nuisance, are repugnant to the provis-

ions of the constitution for the protection of liberty and property, and absolutely void." Livingston's Law Mag. Oct. 1855, 619. In the same case, Judge STRONG is reported to have said: "Property must be protected by law, and that too, without reference to its greater or less utility. The duty of protection extends to whatever has been held and enjoyed as property, by custom and the usages of the country. No power is given to any man or body of men to discriminate. The only attempt that has ever been made in this state, to legislate any species of property out of existence, was in the case of slavery, and there, slaves were not property at common law. The power of alienation is an essential incident to the right of property; and though the manner of selling may be regulated, the right to sell cannot be destroyed. That intoxicating liquors are, and always have been, property at common law, is clear. Imported liquors are expressly recognized as property by law, and whether the state can lawfully prohibit the manufacture of domestic liquors or not, after they have been manufactured, they are evidently property." Upon this point, the judge arrives at the following conclusion: "I consider the statute in question, as mainly prohibiting the sale of intoxicating liquors as a beverage, and destructive of its principal value; and with that impression, I must adjudge it to be null and void to that extent." Thus, two judges, out of three, held the law to be clearly unconstitutional—Judge ROCKWELL maintaining the contrary.

It will be seen from the language of the foregoing extracts, and in fact from that of nearly all the opinions from which we quote, that liquor is constantly recognized as property, and treated as such. The Supreme Court of the United States call it property, and admit it to be such. The courts of Maine have repeatedly decided, that it is property, and that an action might be maintained to recover it, notwithstanding the Maine liquor law declared that no such action could be maintained. The Supreme Court of Massachusetts in the case in 1 Gray, before referred to, call it property, and say that it must be protected as such. The term prop-

erty, in that decision, is applied to it a great number of times. Then if it is property, is there any distinction in the constitution between it and other property? Has not the citizen the same right to acquire, possess, and protect this, that he has any other property? If there is a distinction, in what does it consist? As to whether the provisions of the constitution, allowing citizens to acquire, protect, and possess, are wise or not, is a question with which this court has nothing to do. It may be bad policy to have a bill of rights at all. It may be bad policy to adopt such language as is contained in this particular sentence. But if so, it is no part of the business of this court, to strike out these objectionable features from the constitution. The right of acquiring, necessarily includes the right of purchase; and the right of purchase, necessarily pre-supposes the right to sell, and the right of possessing and protecting. The exercise of the right of possessing this species of property, either in an outhouse, store, or tavern, is only the exercise of a plain constitutional right.—It is not in the power of the legislature to say, that the mere simple act of possessing, protecting, and holding property in this way, is a crime.

The bare exercise of the constitutional right of possessing, is, by the express terms of the liquor law, declared to be a crime; to be evidence of an intent to sell, which subjects the possessor to the penalty of forfeiture of the particular property seized, to a fine of twenty dollars, to be sent to jail for thirty days, to a destruction of his house, and an abatement of the ground on which it stands. Tea would, undoubtedly, be considered property by the constitution. If so, a citizen has a right to acquire it by purchase, to possess it, and to protect it. Now suppose the legislature should enact a tea law, that would forbid the selling, the possessing, and the protecting of tea; suppose they should declare that if a man did possess it, and it was found in his possession, that it should be evidence of an intent to sell tea, contrary to the provisions of the act; and suppose they should declare that the owner of tea would not be allowed to protect it; but that it might be seized and destroyed. Could any

one imagine an act, that would be more directly and diametrically opposed to the exact words of the constitution. The one says, they may acquire, they may possess, they may protect; and the other says, they shall not sell, shall not possess, shall not protect; and that if they do possess the article, that shall be evidence of an intent to commit a crime, the article shall be forfeited, the possessor be fined twenty dollars, and be sent to the jail for thirty days, his house be demolished and the ground be abated on which it stands; and this be no violation of the constitution. Then, if that much should be established as to tea, the next question would be whether coffee was not quite as pernicious, and should not be treated in the same way. And tobacco could not be excused, after proceeding thus far; and then there are various kinds of food, that are held to be hard of digestion, not very nutritious, and generally injurious to health; perhaps some kinds possess too much of the stimulus; all these must be added to the list. And finally, if one kind of property may be treated in this way, any kind may. The constitution says, that a person may acquire, possess, and protect, but the law says he shall do neither; and if he do those very things which the constitution says he may, that exercise of the constitutional right, shall, of itself, furnish evidence of an intent to commit a crime.

The constitution is the anchor of the state; it is a sort of compact entered into by the crew, when they go on board, by which they agree that there shall be no mutiny—that the rights of individuals and of minorities shall be protected, against the acts of the majority; that their private property and private liberty shall be secure. In popular governments, the mutability of the law, is a marked characteristic. Change, change, change, is the order of legislation. Every new set of legislators that are sent up to make laws, generally wipe out all that was done by their predecessors, and enact a new code of laws, no better than those they repeal. The use of a fundamental law—a constitution—an anchor to the ship of state—is, that there shall be something that has some stability; that some of the dearest rights of the citizen shall

be anchored in a manner that will give them safety; that the lives, liberty, and property of citizens shall be secure from this fluctuating, shifting, veering legislation; and whenever the courts shall cut loose from this anchor, and set the ship afloat, at the mercy of the popular view and breezes, there will be no longer any security or safety. The privileges secured by the bill of rights, should be held sacred, for these are the anchor of the law, as the law is the anchor of the republic—*judicia enim anchoræ legum sunt, ut leges republicæ.*

WOODWARD, J.—This cause arises under the act for the suppression of intemperance. All the questions of a constitutional character which are propounded in this cause, are embraced and considered in the case of *Santo et al.* v. *The State, ante,* 165. We will here notice those objections only which apply to this particular cause.

*First.* A motion was made to quash the information, because, whilst the liquor is charged as being in the house of the defendant, no affidavit of a sale at any time, is made, as is required by the act, before the warrant can issue. The act, section 9, directs that if the place to be searched be a dwelling-house in which any family resides, and in which no tavern, eating-house, grocery, or other place of public resort is kept, there shall be a more special affidavit, alleging that the liquor has been sold there. The complaint avers the liquors to be kept " in a certain house or place, known or described as being the house occupied and kept by one Cephas Sanders," on such a lot in Davenport. The counsel have devoted no words to these minor questions, and we shall be brief. The statute qualifies the proceeding, when against a " dwelling-house," or " a house in which a family resides." The complaint does not show the "house" to come within this description ; nor is there a place showing it to be such. We do not think we are bound to hold the word " house " to be equivalent to "dwelling-house," especially, when the statute uses the latter term. We could not do so, under section 2608 of the Code, relating to bur-

glary, if a person were charged with breaking and entering the "house" of A.

*Second.* Cephas Sanders, who appeared in this cause, claiming the property and making defence, pleaded a former conviction in bar. That is, he pleaded as a bar to this complaint and prosecution, the complaint in the foregoing cause against himself, for keeping these liquors for sale. And the question is, whether *his* conviction for keeping them for sale, is a bar to this proceeding against the liquors themselves.

Let us look at the meaning of the act. First; it makes the keeping liquors for sale in the state, an offence. This is personal. Second; it makes liquors kept for sale in the state, a nuisance. Such a nuisance is to be abated by the forfeiture and destruction of the article. His conviction for keeping, does not answer the whole end and object of the law. To fine him for keeping for sale, and then leave the the thing still to be sold, would be an evasion of the intent of the law. That intent is, to remove the occasion of the evil. These two objects might, perhaps, be united in one proceeding; and if they were, it would not be. pretended that his conviction for keeping with intent to sell, would prevent the destruction of the thing. Why, then, should it be a bar, when the two objects are sought in separate proceedings? The act does not seem to contemplate that the liquors *must* be seized, in a proceeding against one for keeping it for sale, but evidently permits it to be pursued separately. We will not say that it *requires* it. This being correct, the conviction of the defendant for keeping with intent to sell, is not a bar to a prosecution against the liquors themselves as a nuisance, and for the abatement of the nuisance.

*Third.* The proposition embraced in the second point above, being correct, it follows that there was no error in the court refusing the two instructions asked upon this subject, as the basis of them is the assumption that the former conviction is a bar.

*Fourth.* The next error assigned is, the overruling the motion for a new trial, upon the ground that after the jury had retired, and before they returned into court with their verdict,

Sanders v. The State of Iowa.

two of the jurors separated from their fellows, and conversed with other persons about their verdict. The affidavit of James M. Cavanaugh, which is offered to sustain this motion, states, that after the jury retired to consider their verdict in the above cause, on Monday evening, October 1, 1855, and before they had returned their verdict into court, to wit: on the Tuesday morning following, two of the jurors—Allen and Palmer—separated from their fellows, and were in the office of the affiant, and conversed in his presence about the case—and that afterward, they were present when the verdict was presented to the court, This bears the semblance of a serious matter. But the record shows that, on the day of the trial, the parties agreed that the jury should seal up their verdict, after agreeing upon it, and return it into court on the next morning; and that on the next morning, to wit, October 2, the jury returned a written and sealed verdict. The affidavit says, that the two jurors were separate from their fellows, on Tuesday morning; and we see no fault in this, under the foregoing arrangement. The charge is, that they conversed with *other* persons; but the affidavit says, they conversed in his (affiant's) *presence* about the case. It does not show that they conversed with another, nor that another person conversed with them. There is no error here.

Throughout these causes, the court has been solicitous not to avoid any question which might fairly be considered as presented; and it is possible that some have been considered which are not properly before us. It is to be regretted that the records are so often in an imperfect or irregular condition. This record shows us no affidavit of appeal; and papers are referred to as exhibits " A." and " B.," &c., whilst no such papers are recognized in the case. With this remark, we pass certain other and lesser questions, believing that all the essential ones are considered.

The judgment of the District Court is affirmed.