MANSFIELD, Justice
(dissenting).
I respectfully dissent.
I. Introduction.
Until today, we have never recognized direct claims under the Iowa Constitution even for actual damages. Historically the Iowa Constitution has been, and continues to be, a vital check on government encroachment of individual rights. Our courts enforce that check by invalidating and enjoining actions taken in violation of the constitution. But we have heretofore indi *882 cated that .damages claims require either (1) legislative authorization or (2) a footing in the common law of torts, contracts,, or some other established common law doctrine. The appeal before us presents neither.
In 1965, our general assembly, passed the Iowa Civil Rights Act (ICRA). See 1965 Iowa Acts ch. 121 (codified as amended at Iowa Code ch. 216 (2009)). From the beginning, the ICRA has applied to “the state of Iowa or any political subdivision, board, commission, department, institution, or school district thereof.” Iowa Code § 105A.2(5) (1966). Today, we learn that the general assembly need not have bothered. Apparently, people who believed they had a civil rights claim against Iowa state or local officials always had a money-damages cause of action, with both actual and punitive damages available. It just took from 1857 until 2017 for someone to figure it out.
I disagree with the notion that constitutional monetary damage claims are some kind of time capsule that the drafters of our .constitution buried in 1857 and that can only be unearthed now' through the legal acumen of this court. The time capsule hasn’t been found until now because no one buried it in the first place. Our framers did not anticipate that someone could simply walk into court with a constitutional provision in hand and file a lawsuit to recover money, including punitive damages. Thus, they provided in article XII, section 1, “This constitution shall be the supreme law of the state, and any law inconsistent therewith, shall be void. The general assembly shall pass all laws necessary to carry this constitution into effect.” Iowa Const, art. XII, § 1 (emphasis added).
This constitutional text forecloses the plaintiffs argument and should be the starting-point for analysis, so I will discuss it first (see Part II below). I will then discuss the authority put forward by the majority for the view that a private right of action exists under the Iowa Constitution (see Part III). Upon examination, the cases cited by the majority demonstrate only that we allow common law torts.
Thereafter, I will turn to a second line of analysis (see Part IV). Even if constitutional monetary damage claims were available in Iowa without legislative authorization or a common law basis, they would not be available to remedy discrimination based on sexual orientation. That is because the legislature has already adopted a comprehensive remedial scheme to which the plaintiff has access. On this point, a majority of the court shares my view.
The plaintiff has invoked that comprehensive scheme in the first two counts of his petition, which were filed under the ICRA and are not part of this appeal. Nothing we do .-today affects those counts. Still, we are upholding the dismissal of all equal protection, claims against the State and against the individual defendants acting within the scope of their employment.
Next, I -mil examine the lead opinion’s conclusion that there is a right to recover punitive damages against the State of Iowa (see Part V).[9] Leading up to today’s decision, the State was the only defendant in this case, and I expect that to continue after today’s ' decision. Meanwhile, the premise of the lead opinion is that there is a constitutional right to sue the State of Iowa under the Iowa Constitution for punitive damages in appropriate cases. This would be a drastic turnabout in Iowa’s *883 legal history. We have never recognized a right to recover punitive damages from the State in any circumstance. To do so without the State’s consent would violate sovereign immunity. The State has never waived sovereign immunity as to punitive damages, presumably because it believes that taxpayer dollars should not be used to pay punitive damage awards as opposed to funding State programs.
Finally, in the last part of this dissent, I will discuss what I believe to be the limits of today’s ruling for this litigation, contrasting those limits with the rather broad and' uncertain implications of the case for Iowa as a whole (see Part VI).
II. The Majority Incorrectly Downplays the Text of Article XII, Section 1, Which Controls the Outcome Here.
Any logical analysis of the issues in this case should begin with the relevant constitutional language in article XII, section 1. Unfortunately, it takes the court until page 45 to discuss this provision.
Article XII, section 1 stands for two propositions. First, in the event of a conflict between a law and the constitution, the constitution wins. Second, the constitution is implemented through laws passed by the general assembly.
To put it another way, the constitution has both negative and positive force. On the negative side, the constitution is a brake that invalidates contrary laws. On the positive side, the constitution empowers the general assembly to enact any laws needed to achieve its purposes.
In 1859, when the adoption of the Iowa Constitution was still fresh in the minds of everyone, our court read the second sentence of article XII, section 1 in precisely this manner:
The constitution provides that offenses of a certain grade, shall be tried originally before justices of the peace, and that .the latter have exclusive original jurisdiction in such cases. Constitution, Article 1, section 11. The Constitution requires the legislature to pass all laws necessary to carry the same into effect. Cons., Article 12, section 1. For the purpose of carrying out this requirement of the constitution, the legislature, at its last session, passed an act reducing the punishment in cases of persons convicted of petit larceny, so as to bring it within the constitutional requirement, that such class of offenses be prosecuted originally before justices of the peace. By the combined force of the constitution, and the laws of the last session, the district court was ousted of jurisdiction in such cases. Session Laws of 1858, 55.
State v. Church, 8 Clarke 252, 254, 8 Iowa 252 (1859).
A later case reiterates this point. In Duncan v. City of Des Moines, we quoted both sentences of article XII,.section 1 and explained, “Our Constitution makers wanted to make sure that this would be the rule adopted. It announced to the people, We are turning the power of the State over to the legislature, but turning it over under the conditions named.’ ” 222 Iowa 218, 231, 268 N.W. 547, 553 (1936).
The majority overstates. It urges that without. today’s decision, the judicial branch would lack power “to craft remedies for constitutional, violations of article 1.” This ignores the first sentence of article XII, section 1, which indicates that the Iowa Constitution, including the bill of rights, is supreme and inconsistent laws are void. We enforce this negative check on a regular basis, invalidating actions taken by state and local governments under color of law. And as part of this negative check we have crafted remedies, such as *884 the exclusionary rule and declaratory and injunctive relief, implementing the basic directive of article XII, section 1 that unconstitutional acts are void.
What we have not done in the past 160 years is to go beyond declaring unconstitutional actions “void,” which we are authorized to do by the first sentence, and assume the legislature’s role under the second sentence. Thus, we have never before permitted damages lawsuits for alleged constitutional violations to go forward in the absence of underlying legislative authority or a recognized common law cause of action. It is simply stunning to me that the majority thinks we need to start allowing such lawsuits today in order to avoid “dramatically under-minting] effective judicial enforcement of the Iowa Bill of Rights.” Has judicial enforcement been lax up until now?
Rhode Island has the same provision as article XII, section 1 in its constitution and its supreme court has read it the same way as I do. See R.I. Const, art. VI, § 1; Bandoni v. State, 715 A.2d 580 (R.I. 1998). In Bandoni, the plaintiffs sought to bring a damages action for alleged violations of a victims’ rights provision contained in the Rhode Island Constitution. Id. at 583.
The extensive discussion that we have given to this issue alone indicates the enormous danger of judicially creating a cause of action when both the constitutional framers and the members of the General Assembly had the same opportunity to create a remedy and yet declined to do so. Instead we are of the opinion that the creation of a remedy in the circumstances presented by this case should be left to the body charged by our Constitution with this responsibility. See R.I. Const, art. 6, sec. 1 (“The general assembly shall pass all laws necessary to carry this Constitution into effect[.]”). In this forum the myriad complex issues presented by the imposition of liability can be fully debated in public....
Under our form of government, ... the function of adjusting remedies to rights is a legislative responsibility rather than a judicial task, and up until the present time the Legislature has not provided a remedy for those instances in which officials fail to inform crime victims of their rights.
Id. at 595-96.
The equal protection clause in the Michigan Constitution ends with language similar to the second sentence of article XII, section 1. It provides, “The legislature shall implement this section by appropriate legislation.” Mich. Const, art. I, § 2. Relying on this language, the Michigan Supreme Court held that a plaintiff who allegedly had been a victim of racial discrimination could not pursue a direct action under the Michigan equal protection clause. See Lewis v. State, 464 Mich. 781, 629 N.W.2d 868, 868, 872 (2001). The court reasoned,
On its face, the implementation power of Const. 1963, art. 1, § 2 is given to the Legislature. Because of this, for this Court to implement Const. 1963, art. 1, § 2 by allowing, for example, money damages, would be to arrogate this power given expressly to the Legislature to this Court. Under no recognizable theory of disciplined jurisprudence do we have such power.
Id. at 871. Noting the distinction blurred by the majority in this case, the Michigan Supreme Court added,
[0]ur holding should not be construed as a demurral to the traditional judicial power to invalidate legislation or other positive governmental action that directly violates the equal protection guaran *885 tee of Const. 1963, art. 1, § 2. There is obviously a distinction between a judicial decree invalidating unconstitutional governmental action and the adoption of judicially created doctrines that effectively serve as de facto statutory enactments to implement Const. 1963, art. 1, § 2.
Id. at 871-72 (footnote omitted).
During the debates on adoption of the 1857 Constitution, the delegates appeared to recognize that constitutional damages suits against the State required separate authorization. At one point the delegates discussed adding language authorizing damage suits against the State if the State took away privileges or immunities it had previously granted. 1 The Debates of the Constitutional Convention of the State of Iowa 104 (W. Blair Lord rep., 1857), www. statelibraryofiowa.org/services/collections/ law-library/iaconst. One delegate criticized the proposal as not going far enough, observing that “a citizen cannot sue the State. Where is he to go, then, to get his damages?” Id. at 105, 2 N.E.2d 102, 105.
When it was then proposed that the provision be strengthened to expressly state that “the State shall be liable to an action at law in any court of record in this State,” id., another delegate responded,
I am opposed to the amendment ... for I do not want to ingraft anything upon the Constitution of the State of Iowa, that will be hable to get the State into an innumerable number of law suits. I do not believe in having the State dragged into the courts of the State. I am opposed to this thing here, and if anything of the sort is to be done, let the legislature make the necessary provision for it.
Id. at 106. A third delegate commented, “I do not believe it would be politic to make a constitutional law that will be the means of getting the State into law suits, the end of which no man can foretell.” Id. A fourth delegate spoke on “the impolicy of making the State a party to a suit at law, in courts of justice!;] and every mind recognizes the impolicy of that practice.” Id. at 110.
In the end, the provision was not adopted. Id. at 115. But the key point is this: these framers understood the State generally could not be sued, even on a constitutional claim, without express authorization from the constitution itself or from the general assembly.
Consistent with the text of article XII, section 1 and this history, we have said on a number of occasions that the provisions of the Iowa Constitution are not self-executing. See Van Baale v. City of Des Moines, 550 N.W.2d 153, 157 (Iowa 1996) (“Although the equal protection clause creates a constitutionally protected right, it is not self-enforcing. Equal protection rights may be enforced only if the Congress or a legislature provides a means of redress through appropriate legislation.” (citation omitted)); State ex rel. Halbach v. Claussen, 216 Iowa 1079, 1091, 250 N.W. 195, 200 (1933) (“The Constitution ... is in no sense self-executing. Its mandates directed to the Legislature must be obeyed in accordance with the provisions made thereby for that purpose.”); Edmundson v. Indep. Sch. Dist., 98 Iowa 639, 646, 67 N.W. 671, 673 (1896) (“The constitutional provision is not self-executing or self-enforcing. It is purely a matter of defense to recovery upon a contract....”); see also Lough v. City of Estherville, 122 Iowa 479, 485, 98 N.W. 308, 310 (1904) (“While a violation of the Constitution in the respect in question is to be condemned, and the courts should interfere to prevent such violation whenever called upon so to do, yet we are not prepared to adopt the suggestion that an action for damages may be resorted to, as affording, a proper means of redress, where a violation has been accomplished.”).
*886 The majority confuses the matter by conflating the first and second sentences of article XII, section 1. When we said in the foregoing cases that the Iowa Constitution was not self-executing, we did not mean that it could not be raised as a defense (or a negative check, the phrase I used earlier), In fact, Edmundson and Halbach make the point that the Iowa Constitution may be raised as a “defense,” Edmundson, 98 Iowa at 647, 67 N.W. at 673, and “must be obeyed,” Halbach, 216 Iowa at 1091, 250 N.W. at 200. All we said is that you can’t bring an affirmative lawsuit for damages for violating the Iowa Constitution absent statutory authority or a common law tort. The majority cites no Iowa case that has ever recognized such a claim.
The majority tries to sidestep the actual text of article XII, section 1 by citing to other provisions in the Iowa Constitution expressly giving the general assembly authority to legislate in • particular areas. I don’t follow the majority’s argument. The majority can’t mean these are the only areas where the general assembly can pass laws. So what is their point?
Typically, these other provisions serve one of two purposes. Some, specify subject areas where the legislature must pass laws, such as the election of an attorney general and the organization of corporations. See, e.g., Iowa Const, art. V, § 12; id. art. VIII, § 1. Others delineate areas where the legislature has greater discretion than usual. See, e.g., id, art. I, § 9; id. art. II, § 7. Yet, in addition, and at the same time, the legislature is exclusively vested with plenary authority to pass whatever other laws it deems “necessary’’ to implement the Iowa Constitution. See id. art. XII, § l.[10]
The majority also places considerable reliance on the heading “Schedule” in article XII. See id. art. XII, Based on this heading, the majority insists that the second sentence of article XII, section 1 is just a temporary provision relating to the “transition” to the 1857 Constitution.
This contention likewise seems to me flawed. The first sentence of article XII, section 1, Iowa’s supremacy clause, is clearly not a transitional provision. See Varnum v. Brien, 763 N.W.2d 862, 875-76 (Iowa 2009) (discussing and relying upon thé first sentence of article XII, section 1). So why. would the very next sentence of section 1 be transitional? Significantly, a number of provisions of article XII have been omitted from the codified version of out' constitution with the note that they were “transitional,” See Iowa Const, art. XII (codified), reprinted in Iowa Code (2009) volume I at p. lvi. Section 1, however, is not among them. See id.
A glance back at our 1846 Constitution further undermines the majority’s position. Like the 1857 Constitution, the 1846 Constitution had an article XIII entitled “Schedule.” Iowa Const, art. XIII (1846). However, that article did not contain any counterpart to section 1. See id. In fact, no counterpart to article XII, section 1 can be found anywhere in the 1846 Constitution. The 1846 article XIII was limited to eight sections, all of which truly were transitional. See id, A logical conclusion is that our framers thought it was important for our 1857 constitution to include the nontransi-tory principles set forth in section 1 (after all, the United States Constitution has a supremacy clause), and decided that article XII was a convenient place to do so.
The majority also highlights the use of the word “this” in both sentences of article *887 XII, section 1. I do not follow the point here, either. Section 1 uses this syntax because it is referring to the constitution that it is a part of, not some other constitution. “This” would be the normal syntax and is used in the Supremacy Clause of the United States Constitution. See U.S. Const, art. VI, cl. 2 (“This Constitution ... shall be the supreme • Law of the Land....”).
In the end, the majority offers no explanation for what the second sentence of section 1 does mean, if it doesn’t have the meaning the district court gave it. '
III. The Majority Confuses Common Law Tort Damage Claims with Damage Claims Based Only on the Iowa Constitution. The Former Have Always Been Allowed; the Latter Have Not.
The majority asserts that we have previously allowed damage lawsuits for violations of the Iowa Constitution to proceed without legislative authorization. The majority is mistaken. What we have permitted are traditional common law tort claims, such as trespass, conversion, malicious prosecution, and abuse of process.
In McClurg v. Brenton, the mayor of Des Moines and “quite a retinue of followers” barged in on plaintiffs home in the middle of the night, without a warrant, based on suspicion that the plaintiff had stolen a neighbor’s chickens. 123 Iowa 368, 369, 98 N.W. 881, 881-82 (1904). “The matter being tried was the alleged trespass upon plaintiffs home.... ” Id. at 374, 98 N.W. at 883. We held the plaintiff had submitted enough evidence to get to the jury and reversed the defense verdict for evidentiary errors, noting,
Even with a warrant, the law of this state forbids a search in the nighttime, save upon a showing therefor, and upon special authority expressed in the writ. Code, § 5555. A right thus carefully -guarded by the statute as well as by the common law is not to be lightly disregarded. '
Id. at 372, 98 N.W. at 882. It takes considerable imagination, I believe, to read McClurg as authorizing damage claims directly under the Iowa Constitution.
Krehbiel v. Henkle involved a teacher who had to furnish a classroom at her own expense with the assistance of some parents. 142 Iowa 677, 678-79, 121 N.W. 378, 379 (1909). (Times do not change.} A disgruntled parent whose cheap pictures were not returned at the end of the year caused a warrant to be issued, and the teacher’s residence was entered and searched. Id. “Thereafter [the owner of the home] instituted this action for damages, alleging that in suing out said warrant and causing the search of his premises for alleged stolen property the [parent] acted willfully, maliciously, and without probable cause.” Id. at 678, 121 N.W. at 379. We held on appeal that the case should have been submitted to the jury because “the evidence tends very clearly to show both malice and want of probable cause.” Id. at 680, 121 N.W. at 380.
Although we did mention article I, section 8 of the Iowa Constitution, the cause of action was a recognized common law claim for trespass and malicious prosecution. Id. at 679-80, 121 N.W. at 379. Notably, the defendant was not a public official subject, to article I, section 8, but a private party—i.e., the disgruntled parent. Id. at 678-79, 121 N.W. at 379.
The third case relied on by the majority, Girard v. Anderson, also was between private parties. 219 Iowa 142, 143, 257 N.W. 400, 400 (1934). The plaintiff bought a piano from the defendant but fell behind on the payments. Id. Two of the defendant’s employees allegedly broke and entered *888 into the plaintiffs home to repossess the piano. Id. at 144, 257 N.W. at 400. The plaintiff sued. Id. at 144-45, 257 N.W. at 401. We held the plaintiff had triable claims as to both trespass and conversion. Id., at 145, 257 N.W. at 401. The main issue in the case was whether the defendant could rely on language in the piano sales contract to justify his agents’ entry into the plaintiffs home. Id. We decided otherwise:
' We are not willing to adopt a rule that will permit the seller under a contract of this kind to take the law into his own hands by forcibly retaking possession of property sold, where any resistance is offered by the purchaser.
Id. at 149, 257 N.W. at 403.
In the course of our opinion in Girard, we quoted article I, section 8, recognizing that it protects “the sacredness of the home.” Id. at 148, 257 N.W. at 402. We also cited McClurg and Krehbiel and said, “A violation of the state and federal constitutional provisions against the unreasonable invasion of a person’s home gives the injured party a right of action for damages for unlawful breaking and entering.” Id. at 148, 257 N.W. at 403. But as in those two cases, the actual cause of action was an established one under the common law. Id. at 145, 257 N.W. at 401. To put it another way, these causes of action did not depend on the existence of article I, section 8, but were traditional common law claims and would have gone forward even if article I, section 8 were not part of our constitution. The majority’s three cases need to be juxtaposed with the caselaw already discussed where we said the provisions of the Iowa Constitution are not self-executing:[11]
IV. The ICRA Remedy for the Alleged Discrimination Is Exclusive and This Court Lacks Authority to Devise a Different Remedy That It Might Prefer.
Even when direct damage lawsuits have been permitted under other state constitutions (i.e., constitutions that do not have a counterpart to article XII, section 1), they are typically not allowed when the legislature already has devised a remedial system for the same wrong. Employment discrimination claims in Iowa are an area where the legislature has devised such a remedial scheme.
In Iowa, the general assembly has directed that a person “claiming to be aggrieved by an ‘ unfair or ' discriminatory practice must initially seek an administrative relief,” and thereafter may bring a civil action under the ICRA. See Iowa Code § 216.16(1), (2). This remedy is “exclusive.” Smidt v. Porter, 695 N.W.2d 9, 17 (Iowa 2005) (“To the extent the ICRA provides a remedy for a particular discriminatory practice, its procedure is exclusive and the claimant asserting that practice must pursue the remedy it affords.”); see Northrup v. Farmland Indus., Ind., 372 N.W.2d 193, 197 (Iowa 1985) (stating that “the procedure under the civil rights act is exclusive, and a claimant asserting a discriminatory practice must pursue the remedy provided by the act”); see also Channon v. United Parcel Serv., Inc., 629 N.W.2d 835, 858 (Iowa 2001) (reiterating *889 Northrup’s holding and citing additional eases); Kingsley v. Woodbury Cty. Civil Serv. Comm’n, 459 N.W.2d 265, 266 (Iowa 1990) (noting that “the exclusive remedy for complainants asserting a discriminatory act-lies with the procedure provided in [the ICRA]”).
In the analogous federal context, courts have uniformly held that Title VII of the federal Civil Rights Act of 1964 provides the exclusive remedy for claims of discrimination in federal employment. See Brown v. Gen. Servs. Admin., 425 U.S. 820, 835, 96 S.Ct. 1961, 1969, 48 L.Ed.2d 402 (1976). Bivens actions for employment discrimination are therefore barred. Zeinali v. Raytheon Co., 636 F.3d 544, 549 n.3 (9th Cir. 2011) (“Title VII ‘provides the exclusive judicial remedy for claims of discrimination in federal employment.’ ” (quoting Brazil v. U.S. Dep’t of Navy, 66 F.3d 193, 197 (9th Cir. 1995))); Ethnic Emps. of Library of Cong. v. Boorstin, 751 F.2d 1405, 1415 (D.C. Cir. 1985) (“[FJederal employees may not bring suit under the Constitution for employment discrimination that is actionable under Title VIL”).
The lead opinion glosses over the Supreme Court’s substantial reluctance to coin new causes of action based on the federal constitution post-Bivens. With nothing more than a string cite, the lead opinion discounts over three decades of Supreme Court jurisprudence declining to expand Bivens remedies beyond the specific circumstances of Bivens, Davis, and Green. See Ziglar v. Abbasi, 582 U.S.—, 137 S.Ct. 1843, 1857, 198 L.Ed.2d 290 (2017) (“[TJhe Court has made clear that expanding the Bivens remedy is now a ‘disfavored’ judicial activity.” (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009))); Minneci v. Pollard, 565 U.S. 118, 120, 131, 132 S.Ct. 617, 620, 626, 181 L.Ed.2d 606 (2012) (rejecting Bivens action under Eighth Amendment against employees of privately operated federal prison); Wilkie v. Robbins, 551 U.S. 537, 555, 127 S.Ct. 2588, 2600, 168 L.Ed.2d 389 (2007) (declining to allow Bivens action by private landowner under Due Process Clause-for Bureau of Land Management interference with property rights); Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 63, 74, 122 S.Ct. 515, 517, 523, 151 L.Ed.2d 456 (2001) (determining no Bivens remedy unavailable against a private corporation operating a halfway house under government contract); F.D.I.C. v. Meyer, 510 U.S. 471, 486, 114 S.Ct. 996, 1006, 127 L.Ed.2d 308 (1994) (declaring that no Bivens claim could be brought against a governmental agency); Schweiker v. Chilicky, 487 U.S. 412, 429, 108 S.Ct. 2460, 2471, 101 L.Ed.2d 370 (1988) (stating no Bivens claim available under Due Process clause for employees who were denied Social Security benefits); United States v. Stanley, 483 U.S. 669, 686, 107 S.Ct. 3054, 3065, 97 L.Ed.2d 550 (1987) (declining to allow Bivens claim in military context); Bush v. Lucas, 462 U.S. 367, 368, 103 S.Ct. 2404, 2406, 76 L.Ed.2d 648 (1983) (declining to allow Bivens claim under the First Amendment for federal employee who was demoted); Chappell v. Wallace, 462 U.S. 296, 304, 103 S.Ct. 2362, 2368, 76 L.Ed.2d 586 (1983) (rejecting Bivens claim because of special factors counseling hesitation in context of the military).
In general, the Supreme Court has determined that “[s]o long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability.” Malesko, 534 U.S. at 69, 122 S.Ct. at 520; see also Minneci, 565 U.S. at 129, 132 S.Ct. at 625 (stating even though other remedies may “prove less generous” by capping damages, forbidding emotional distress damages, or imposing procedural obstacles, it could not find a “sufficient basis to determine state law inadequate”); *890 Wilkie, 551 U.S. at 553, 127 S.Ct. at 2600 (“In sum, Robbins has an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints.").
Other state courts have followed the same reasoning in declining to layer a state constitutional remedy on top of an existing state statutory remedy. See Kelley Prop. Dev., Inc. v. Town of Lebanon, 226 Conn. 314, 627 A.2d 909, 922 (1993) (“[W]e should not construe our state constitution to provide a basis for the recognition of a private damages action for injuries for which the legislature has provided a reasonably adequate statutory remedy.”); see also Lowell v. Hayes, 117 P.3d 745, 753 (Alaska 2005) (“[W]e will not allow a constitutional claim for damages, ‘except in cases of flagrant constitutional violations where little to no alternative remedies are available.’” (quoting Dick Fischer Dev. No. 2, Inc. v. Dep’t of Admin., 838 P.2d 263, 268 (Alaska 1992))); Katzberg v. Regents of Univ. of Cal., 29 Cal.4th 300, 127 Cal.Rptr.2d 482, 58 P.3d 339, 356 (2002) (reasoning that the availability of adequate alternative remedies “militates against judicial creation of” a constitutional remedy); Bd. of Cty. Comm’rs v. Sundheim, 926 P.2d 545, 553 (Colo. 1996) (en banc); Baker v. Miller, 159 Ill.2d 249, 201 Ill.Dec. 119, 636 N.E.2d 551, 559 (1994); Rockhouse Mountain Prop. Owners Ass’n v. Town of Conway, 127 N.H. 593, 503 A.2d 1385, 1388 (1986); Provens v. Stark Cty. Bd., 64 Ohio St.3d 252, 594 N.E.2d 959, 965-66 (1992); Spackman ex rel. Spackman v. Bd. of Educ., 16 P.3d 533, 539 (Utah 2000) (“[W]e urge deference to existing remedies out of respect for separation ,of powers’ principles.”); Shields v. Gerhart, 163 Vt. 219, 658 A.2d 924, 933 (1995) (“We have been cautious in creating a private damage remedy even where the Legislature has provided no alternative civil remedy.”).
It is instructive to consider cases in which, as here, employment discrimination was' the alleged wrong. The Ohio and Illinois Supreme Courts, as well as-a well-reasoned federal district court opinion interpreting New York law,'have all concluded that when a plaintiffs constitutional employment .discrimination claim can also be pursued under the state’s civil rights statutes, no separate constitutional claim is available.
Thus, in Provens v. Stark County Board, the Ohio Supreme Court declined to recognize an independent cause of action under the Ohio Constitution for compensatory and punitive damages for discrimination. 594 N.E.2d at 965-66. The plaintiff in Provens was a teacher.at a state-run school. Id. at 959-60. In her complaint, Provens alleged that supervisors at the facility “had harassed, discriminated against, and disciplined her,” and.further retaliated against her because she had initiated a lawsuit against employees of the board. Id. at 960. Provens sought injunc-tive relief, compensatory damages, and punitive damages. Id. The trial court granted summary judgment in favor of the state, in part because “it would be inappropriate for the court to create a new judicial remedy.” Id. at 961.
On appeal, the Ohio Supreme. Court affirmed. Id. at 966. Although the court noted that Provens had not specified which of her rights had allegedly been violated, after reviewing the record the court determined “a significant basis for the allegations contained in plaintiffs complaint were harassment claims with racial connotations.” Id. at 964. Relying on the United States Supreme Court decision in Bush, the court reasoned that the relevant question was not “what .remedy the court should provide for a wrong that would otherwise go unredressed,” but instead, “whether -an elaborate remedial system *891 that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue.” Id. at 963 (quoting Bush, 462 U.S. at 388, 103 S.Ct. at 2416-17). Accordingly, the court pointed out that the Ohio civil rights act “does provide the plaintiff with some meaningful available relief.” Id. at 963; see Ohio - Rev. Code Ann. ch. 4112 (West, Westlaw current through 2017 flies 6S 8, and 9 of 132d Gen. Assemb.). Specifically, under Ohio law, if the Civil Rights Commission determines that an employer has engaged in an unlawful discriminatory practice, the commission may order injunc-tive relief or any other action “including, but not limited to, hiring, reinstatement, or upgrading of employees with, or without, back pay.” Provens, 594 N.E.2d at 964 (quoting Ohio Rev. Code Ann. § 4112.05(G)). The court further noted that the plaintiff may have rights' under the state’s collective bargaining laws. Id. at 965.
With these principles in mind, the Ohio Supreme Court concluded,
While the . remedies provided. the plaintiff here through the,administrative process of a hearing before the [Civil Rights Commission] and through the arbitration process under the collective bargaining agreement do vary from the remedies that might '.be available through a civil proceeding, such difference shall not be controlling where, in the totality, it may be concluded that the public employee has been provided sufficiently fair and comprehensive remedies....
[[Image here]]
... [I]t is not incumbent upon this court to engage in the type of comparative analysis of the relative merits of various remedies that is invited by appellant. Rather, the more appropriate course for this court is to defer to the legislative process of weighing conflicting policy considerations and creating certain administrative bodies and processes for providing remedies for public employees such as appellant.
We hold, therefore, that public employees do not have a private cause of civil action against their employer to redress alleged violations by their employer of policies embodied in the Ohio Constitution when it is determined that there are other reasonably satisfactory remedies provided by statutory enactment and administrative process.
Id. at 965-66.
Similarly, in Baker, the Illinois Supreme Court rejected an employment discrimination claim for compensatory and punitive damages brought directly under article I, section 17 of the Illinois Constitution. 201 Ill.Dec. 119,, 636 N.E.2d at 552, 559. The court noted at the outset that the guarantees 'of that constitutional provision—freedom from discrimination in housing and employment—had been legislatively implemented through the Illinois Human Rights Act. Id., 201 Ill.Dec. 119, 636 N.E.2d at 553. The court recognized that the Act was the exclusive remedy in Illinois for employment discrimination, and “therefore, a covered employee [under that- Act] may not bring a private cause of action to recover damages-for a violation of . his rights under article I, section 17.” Id., 201 Ill.Dec. 119, 636 N.E.2d at 554. The main issue in Baker was' whether or not the plaintiff was covered under the Act. See id. Hence, after concluding she was covered, the court reasoned she was precluded, from bringing a constitutional claim, in part because the Act provided the plaintiff with “a comprehensive and systematic mechanism for the investigation and disposition of discrimina *892 tion claims.” Id., 201 Ill.Dec. 119, 636 N.E.2d at 569.
Likewise, in Muhammad v. New York City Transit Authority, the court rejected the plaintiffs attempt to constitutionalize her discrimination claims against her employer, a public transit authority. 450 F.Supp.2d 198, 209-12 (E.D.N.Y. 2006). The complaint raised various claims under federal law, state law, and the New York Constitution, several of which were subject to a pretrial motion to dismiss. Id. at 202.
Regarding the state constitutional claim, the court noted that the New York Court of Appeals had previously recognized a damages remedy under the state’s equal protection clause in Brown v. State, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1141 (1996). Muhammad, 450 F.Supp.2d at 210-11. However, as the federal district court explained, “the Court of Appeals subsequently characterized Broum as creating only a ‘narrow remedy.’ ” Id. at 211 (quoting Martinez v. City of Schenectady, 97 N.Y.2d 78, 735 N.Y.S.2d 868, 761 N.E.2d 560, 563 (2001)). “In Brown itself, neither declaratory nor injunctive relief was available to the plaintiffs.... For those plaintiffs it was damages or nothing.” Id. (quoting Martinez, 735 N.Y.S.2d 868, 761 N.E.2d at 563). Hence, the district court contrasted Brown with the potential avenues available to the plaintiff in order to remedy employment discrimination— namely, New York Human Rights Law. Id. at 212. The court concluded,
Defendant specifically notes that New York Human Rights Law “prohibits discrimination in employment based on religion, and expressly provides a private right of action for an employee allegedly discriminated against on the basis of his or her religion.” Future, similar constitutional violations may be deterred if plaintiff successfully exploits that avenue. Accordingly, recognition of a State constitutional tort is unnecessary in this case to afford plaintiff a remedy. [The claim] is, therefore, dismissed.
Id. (citations omitted).
Along the same lines, other state courts have allowed constitutional claims in the employment context only when there appears to be no available statutory remedy. In Corum v. University of North Carolina, the court indicated that the plaintiff had a direct damages remedy against his employer under the state constitutional provision protecting freedom of speech. 413 S.E.2d 276, 290 (N.C. 1992). However, the court noted the “critical limitation! ]” that the court “must bow to established claims and remedies where these provide an alternative to the extraordinary exercise of [the judiciary’s] inherent constitutional power.” Id. at 291. Similarly, in Peper v. Princeton University Board of Trustees, the court recognized the constitutional cause of action, but only after concluding that the plaintiff’s private-university employer was not a statutorily defined “employer” the applicable state discrimination laws. 77 N.J. 55, 389 A.2d 465, 474, 478 (1978).
Maryland, which should be viewed as an outlier, has permitted discrimination claims under the Maryland state constitution despite the availability of a statutory remedy. See Manikhi v. Mass Transit Admin., 360 Md. 333, 758 A.2d 95, 110-11 (2000). However, such state constitutional claims are subject to a statutory damages cap in the Local Government Tort Claims Act, which has been found applicable and enforceable to constitutional claims. See Espina v. Jackson, 442 Md. 311, 112 A.3d 442, 462-63 (2015). Hence, even if we applied the Maryland approach in Iowa, the statutory bars to recovery of punitive damages in Iowa’s government tort laws would be applicable and enforceable.
Here, as I have already noted, there is no dispute that Godfreys employ *893 er, the State of Iowa, is an “employer” within the meaning of the ICRA, see Iowa Code § 216.2(7), and thus in my view, the Act provides Godfrey with an adequate statutory remedy. The reasoning of the Ohio, Illinois, and New York courts is persuasive.
At best, article XII, section 1 might be read as requiring the general assembly to enact a damages remedy for constitutional violations. In the ICRA, the legislature has done that with respect to employment discrimination by state and local officials. Once the legislature has provided a remedy, it is not the role of the judiciary to provide a different remedy unless the existing remedy is so deficient as to amount to a denial of due process.[12]
The ICRA’s language is mandatory and comprehensive. It provides that a person claiming to be aggrieved by a discriminatory act “must” follow the procedures therein. Id. § 216.16(1). We have no business striking down the mandatory and exclusive language in the ICRA, and I am glad we are not doing so today.
V. The Lead Opinion Authorizes the State to be Sued for Punitive Damages in Disregard of Sovereign Immunity, Longstanding Tradition, and the Express Language of the Iowa Tort Claims Act.
The lead opinion cites the availability of punitive damages as its justification for authorizing a parallel article I, section 6 track to the existing ICRA track. However, the Iowa Tort Claims Act (ITCA) does not allow punitive damages to be awarded against the State. Id. § 669.4. In other words, the State has not waived sovereign immunity as to punitive damages, and I am not aware of an Iowa court having refused to honor this limit.[13]
A full discussion of this issue requires some clarity about the parties to this case. Originally, the attorney general certified that all individual defendants named in this petition were acting in their official capacities with respect to all claims. See id. § 669.5(2)(a); Godfrey v. State, 847 N.W.2d 578, 581 (Iowa 2014). This resulted in the dismissal of the individual defendants from the lawsuit. Id. at 581-82. However, in an earlier appeal, we reversed that dismissal in part. Id. at 588. We held the certification did not apply to claims brought against the individual defendants “in their individual capacities,” i.e., to the extent these defendants were not “acting within the scope of their employment.” Id. at 586. Still, we said that the individual defendants could “file a motion for summary judgment to resolve this issue.” Id.
Subsequently, the defendants filed two separate motions for partial summary judgment. One was to dismiss the constitutional claims (Counts VI through IX) against all defendants based on the absence of a private right of action. The *894 other was to dismiss the remaining- claims against the individual defendants on the ground they had acted only in their official, not individual, capacities. The first motion was granted and is the subject of the present appeal. The plaintiff then conceded he had no factual basis for opposing dismissal of any remaining claims, against the individual defendants, so those claims were voluntarily dismissed, As a result, the State of Iowa is presently the only defendant in this case.
While today’s decision has the effect of reinstating somé of the constitutional claims, those claims appear to involve exclusively actions taken by the defendants in their official capacities. Count VI under article I, section 9 of the Iowa Constitution challenges the conduct of the defendants in “demanding Plaintiffs resignation” and “drastically reducing Plaintiffs salary.” Count VII, likewise brought under article I, section 9, alleges the defendants “deprived Plaintiff of a protected liberty interest by stigmatizing Plaintiff, by publicly and falsely claiming that their illegal and unreasonable demands for his resignation and ultimate reduction in his pay were due to Plaintiffs - poor work performance.” Count IX alleges that the defendants deprived the plaintiff of equal protection in violation of article I, section 6 when they slandered the plaintiff and reduced his salary.[14]
■ Thus, when the dust settles below, I think it is clear that the. State will remain the only defendant. Regardless of the ultimate merits of the plaintiffs constitutional claims, they concern actions taken by the individual defendants in their official capacities. Any request to the plaintiff to resign or effort to reduce his salary would have been undertaken in that defendant’s official capacity. Arid the plaintiff has already conceded, when he accepted the dismissal of. his common law defamation claims, that he “has been unable to develop evidence that the individual Defendants were acting outside the scope of their employment” when they made the allegedly defamatory comments.
Moreover, the plaintiff has previously conceded in this litigation that he is not entitled to punitive damages against the State. See Godfrey, 847 N.W.2d at 581 (quoting -plaintiffs counsel). So if that is the justification for creating a, direct cause of action against the State under the Iowa Constitution, it is a strange one. The plaintiff has already disavowed this ground.[15]
Under the doctrine of sovereign immunity, the State is immune from tort liability “[ejxcept where consent has been, given by the legislature.” Montandon v. Hargrave Constr. Co., 256 Iowa 1297, 1299, 130 N.W.2d 659, 660 (1964). At the time of our State’s founding, this doctrine was absolute: “No tort action could be maintained against the State or its agencies.” Don R. Bennett, Handling Tort Claims and Suits Against the State of Iowa: Part I, 17 Drake L. Rev. 189, 189 (1968). Instead,
one who suffered damage as the result of a negligent or wrongful act of a State employee had the limited choice of bringing suit against the employee personally or seeking redress from the Iowa General Assembly in the form of private relief.

Id.

As early as 1875, this court explored the meaning of sovereign immunity in Metz v. *895 Soule, Kretsinger & Co., 40 Iowa 236, 239-41 (1876). The plaintiff in Metz was an inmate at the State penitentiary who brought suit against the contractor of the facility for negligent construction. Id. at 236. Prior to filing suit, though, the plaintiff had petitioned the general assembly and received a legislative appropriation consisting of monthly payments. Id. at 236-37. Although a jury rendered a verdict for the plaintiff against the defendant contractor, we reversed on appeal, concluding that the general assembly’s earlier payment constituted an accord and satisfaction. Id. at 238 (“There can be but one satisfaction for a wrong.”).
The defendant filed a petition for rehearing, “in which it [was] strenuously urged that the foregoing opinion ignores the maxim that, The king can do no wrong.” Id. at 239. In a denial of rehearing, we agreed with the State and reaffirmed our doctrine of sovereign immunity, clarifying the maxim means that any-redress by the State “must be voluntary, and cannot be coerced.” Id. at 240. Relying on the Blackstone Commentaries, we said,
Perhaps [the maxim] means that, although the kind is subject to the passions and infirmities of other men, the constitution has prescribed ho mode by which he can be made personally amenable for any wrong which he may actually commit. The law will, therefore, presume no wrong where it has provided no remedy.
Id., at .239-40, (quoting 1 William Blackstone, .Commentaries *246). Hence, we said that Metz had “pursued the decent and respectful mode of- appealing to the State legislature,” and further that it was “clearly implied” in our opinion that “Metz could not have maintained an action against the State.” Id. at 240.1 don’t read Metz as indicating that the Iowa Constitution provides plaintiffs a remedy, absent some kind of clear legislative action. See also Wood v. Boone Cty., 153 Iowa 92, 100, 133 N.W. 377, 380 (1911) (“It is a general rule that, where a governmental duty rests upon a state or any of its instrumentalities, there is absolute immunity in respect to all acts or agencies.”).[16]
In 1965, the general assembly did partially waive the State’s sovereign immunity in the ITCA. See 1965 Iowa Acts ch. 79, § 4 (codified as amended at Iowa Code section 669.4). Since then, wé have recognized that the State’s waiver is “limited” to the boundaries of the ITCA. Hook v. Trevino, 839 N.W.2d 434, 439 (Iowa 2013); accord Graham v. Worthington, 259 Iowa 845, 867, 146 N.W.2d 626, 634 (1966); see also Jones v. Univ. of Iowa, 836 N.W.2d 127, 141-42 (Iowa 2013) (“The waiver of sovereign immunity, however, applies only to the actions specified in the statute.”). For example, section 669.14 defines numerous claims as to which the State retains its immunity from tort liability. See Iowa Code § 669.14. In Lloyd v. State, we explained,
*896 Section [669.14] makes clear the legislature did not intend the Iowa Tort Claims Act to be a waiver of sovereign immunity in all instances. It was designed primarily to remove sovereign immunity for suits in tort with certain specified exceptions set out in the statute.
Under the Act the State or its agencies is subject to suit in tort as an individual only in the manner and to the extent to which consent has been given by the legislature. The immunity of the State is from suit rather than from liability and remains the rule rather than the exception.
251 N.W.2d 551, 555 (Iowa 1977).
As a result, we have consistently held that when the general assembly has not waived immunity to suit, any damage claim against the State or its officials is barred. See, e.g., Jones, 836 N.W.2d at 141-43; Minor v. State, 819 N.W.2d 383, 406 (Iowa 2012) (“[WJhere the basis of the plaintiffs claim is the functional equivalent of a cause of action listed in section 669.14(4), the government official is immune.”); Sanford v. Manternach, 601 N.W.2d 360, 371 (Iowa 1999); Magers-Fionof v. State, 555 N.W.2d 672, 675 (Iowa 1996); Genetzky v. Iowa State Univ., 480 N.W.2d 858, 861 (Iowa 1992); Engstrom v. State, 461 N.W.2d 309, 320 (Iowa 1990); Greene v. Friend of Ct., 406 N.W.2d 433, 436 (Iowa 1987); North v. State, 400 N.W.2d 566, 570 (Iowa 1987); Montandon, 256 Iowa at 1299, 130 N.W.2d at 660 (“Except where consent has been given by the legislature the state is immune from suit.”); Yoerg v. Iowa Dairy Indus. Comm’n, 244 Iowa 1377, 1387, 60 N.W.2d 566, 571 (1953).
All this authority is brushed away, as the lead opinion today finds a previously undiscovered right to recover punitive damages against the State as long as the lawsuit is couched in constitutional terms. But our precedent is to the contrary. We earlier concluded that except as waived by the legislature, sovereign immunity applies even when an alleged deprivation of constitutional rights is involved. For example, in Sanford, we affirmed the dismissal of the plaintiffs damages claim “for the deprivation of good-conduct time” in prison, something that clearly involved a liberty interest. 601 N.W.2d at 370-72. Similarly, the plaintiff in Yoerg claimed that a state commission’s failure to remit an excise tax resulted in a violation under the Iowa Constitution. 244 Iowa at 1379, 60 N.W.2d at 567. Nonetheless, we determined “the suit against the commission was substantially against the state, which was immune therefrom.” Id. at 1387, 60 N.W.2d at 571.
Recognizing that the doctrine of sovereign immunity may bar constitutional damage claims is not some novel concept. In Figueroa v. State, the Hawaii Supreme Court declined to create a private right of action for damages based on provisions of the Hawaii Constitution, in part because the court determined it was “not free to abolish the State’s sovereign immunity.” 61 Haw. 369, 604 P.2d 1198, 1205 (1979). Notably, the Figueroa court reached that conclusion even though the state constitution expressly provided that all of its provisions are self-executing. Id. at 1206. The court reasoned:
The self-executing clause only means that the rights therein established or recognized do not depend upon further legislative action in order to become operative. No case has construed the term “self-executing” as allowing money damages for constitutional violations. More importantly, in a suit against the state, there cannot be a right to money damages without a waiver of sovereign immunity and we regard as unsound the argument that all substantive rights of necessity create a waiver of sovereign *897 immunity such that money damages are available.
Id. (citations omitted). Still other state supreme courts have held similarly. See State Bd. of Educ. v. Drury, 263 Ga. 429, 437 S.E.2d 290, 294 (1993) (“Although a citizen may be entitled to seek enforcement of his constitutional rights, the means of that enforcement does not necessarily take the form of a recovery of damages against the state.”); Livingood v. Meece, 477 N.W.2d 183, 190 (N.D. 1991) (“[T]his court has specifically applied sovereign immunity as a bar to a direct cause of action against the state based on the alleged violation of state constitutional provisions, assuming that such a cause of action exists.”); Rockhouse Mountain Prop. Owners Ass’n, 503 A.2d at 1389 (rejecting a claim for damages under the due process and equal protection clauses of the state constitution in part because of “the incompatibility of that remedy with the limited municipal and official immunity that our cases have recognized as desirable”); see also Garcia v. Reyes, 697 So.2d 549, 550 (Fla. Dist. Ct. App. 1997) (“To allow Garcia to bring a cause of action based on a violation of our state’s constitution ... would extend the waiver of sovereign immunity beyond the stated intent of the statute.”).[17]
The lead opinion goes a step further. Not only does it allow actual damages against the State without the State’s consent, it also refers to “[t]he necessity of the availability of punitive damages” in justifying a direct action under the Iowa Constitution. Of course, the lead opinion can’t make this jump using Iowa law or our precedent—we have “clearly and repeatedly” concluded that punitive damages cannot be awarded under the ICRA, Ackelson v. Manley Toy Direct, L.L.C., 832 N.W.2d 678, 688 (Iowa 2013), and the legislature has plainly declared that “the state shall not be liable ... for punitive damages” under the ITCA. Iowa Code § 669.4; see also Young v. City of Des Moines, 262 N.W.2d 612, 622 (Iowa 1978) (noting that punitive damages are “specifically precluded” under the ITCA), overruled on other grounds by Parks v. City of Marshalltown, 440 N.W.2d 377, 379 (Iowa 1989); Speed v. Beurle, 251 N.W.2d 217, 219 (Iowa 1977) (“The state’s immunity for torts of its employees was waived as to compensatory damages but not as to punitive damages .... ”).
Here the lead opinion backs itself into a corner. Godfrey’s constitutional damage claims are still “claims” against State officials within the meaning of Iowa Code chapter 669, See Iowa Code § 669.2(3)(6) (defining “claim” as “[a]ny claim against an employee of the state ... caused by the negligent or wrongful act or omission of any employee”). But punitive damages are expressly barred. Id. § 669.4.
While there’s no question that Iowans have long been able to recover punitive damages in general, see Cochran v. Miller, 13 Iowa 128, 131 (1862), conspicuously absent from the majority’s opinion is any discussion of precedent from this court allowing punitive damages against the State.
*898 We have also previously held that there is no “vested right” to punitive damages. Shepherd Components, Inc. v. Brice Petrides-Donohue & Assocs., 473 N.W.2d 612, 619 (Iowa 1991) (upholding the constitutionality of Iowa Code section 668A.1). The legislature can limit punitive damages even in a suit between two private parties. See id. If punitive damages are not a matter of right, how can the mere unavailable ty of such damages render a remedy constitutionally inadequate?
If the lead opinion were correct that there is a constitutional right to recover punitive damages from' the State in’ appropriate cases, I am at a loss to understand how that would work in the real world. Let’s assume that a plaintiff could demonstrate that the defendant’s actions “constituted -willful and wanton disregard,” Iowa Code § 668A.l(l)(a), but not that the conduct was “directed specifically at the claimant, or at the person from which the claimant’s claim is derived.” Id. § 668A.1(1)(6). In that case, the trial court may direct up to twenty-five percent of the punitive damages to be awarded to the claimant, “with the remainder of the award to be ordered paid into a civil reparations trust fund administered by the state court administrator.” Id, § 668A.1(2)(6) (emphasis added). So would most of the award cycle back to the State (although admittedly to a special fund)? Or does section 668A.1 even apply? As we have seen, the lead opinion’s constitutional bulldozer has already pushed aside section 216.16(l)’s exclusivity language and section 669.4’s bar on punitive damages. Would it also get to knock down section 668A.1?
Another question arises. How is a jury supposed to assess the “financial worth” of the State in setting the punitive damage award? See McClure v. Walgreen Co., 613 N.W.2d 226, 233 (Iowa 2000). Will we have jurors examining the State budget? •
And there is no logical reason to draw the line at punitive damages. The lead opinion amounts to a judicial declaration of defiance. The lead opinion signals that it will not be constrained by anything the legislature does and can devise any and all damage remedies it deems suitable and proper for alleged constitutional violations. This principle seems to lack any boundary. Can the court provide for a ten-year statute of limitations? Can the court eliminate any and all forms of immunity?
At this point, a majority of this court has not decided that punitive damages may be awarded against the State on a constitutional claim. As I have tried to show, the availability of punitive damages would be a reason not to allow direct constitutional claims against the State.
VI. The Impact of Today’s Decision on this Case May be Limited, but It Will Have Wide-Reaching Effects Throughout State and Local Government.
Today’s decision may not end up altering the result in this case. The amici urge us to dispose of the due process claims on independent grounds. They argue that a high-level state policymaking official such as a workers’ compensation commissioner has no due process right to a particular, salary, no due process right to be free from criticism for “poor work performance,” and no due process right to be insulated from “partisan” political action. These arguments weren’t advanced by the defendants, so they are not addressed by the majority. Still, they remain open issues in this case.
Additionally, the plaintiffs counsel conceded at oral argument that if the defendants reduced the plaintiffs salary not because of his sexual orientation or his political affiliation, but simply because they disagreed with his policies as work *899 ers’ compensation commissioner, there would be no constitutional claim.
While the impact of today’s decision in this case may be limited, there should be no doubt about its far-reaching effects elsewhere. I anticipate many claims from current and former inmates seeking damages for wrongful incarceration. True, if you read the Iowa Code, the State has not waived sovereign immunity as to such claims except in the limited circumstances presented by chapter 663A. See Iowa Code §§ 663A.1, 669.14(4). But now an inmate can bring a direct claim for damages under article I, section 10 (ineffective assistance of counsel), article I, section 9 (due process of law), or article I, section 17 (cruel and unusual punishment).
Sanford would now be decided differently; yet it is just one example. To give another illustration, in light of this court’s juvenile sentencing decisions, I would expect individuals who have been resen-tenced because their earlier sentences violated article I, section 17 to seek damages for the constitutional violation.
For the foregoing reasons, I would affirm the district court.
Waterman and Zager, JJ., join this dissent.

. As I read it, the opinion concurring in part and dissenting in part takes no final position on this issue.

. For example, contrast the language of arti-ele V, section 14 ("It shall be the duty of the general assembly to provide for the carrying into effect of this article, and to provide for a general system of practice in all the courts of this state,”), with that in article XII, sectjon 1,

. The court also mentions State v. Tonn, 195 Iowa 94, 191 N.W. 530 (1923), abrogated on other grounds by State v. Cline, 617 N.W.2d 277, 291 (Iowa 2000). This, however, was a criminal case where our court rejected the applicability of the exclusionary rule in state criminal prosecutions. Id. at 107, 191 N.W. at 536. We did state, "A trespassing officer is liable for all wrong done in an illegal search or seizure.” Id. at 106, 191 N.W. at 535. We did not discuss the specific basis for liability— whether it was trespass or the Iowa Constitution. The use of "trespassing” in our sentence suggests the former. We also did not discuss whether liability meant damages liability.

. The lead opinion tries to pigeonhole the defendants’ argument as one of classic preemption. The issue is not classic preemption in the sense that one law invalidates another law, but an issue of whether this court should establish a damages remedy of its own liking for allegedly unconstitutional conduct when the legislature has already done so.

. The lead opinion observes that the State did not discuss sovereign immunity in its appellate brief. If the lead opinion is trying to make a point about error preservation, it is simply wrong. The State was the appellee; Godfrey was the appellant. In his briefing, Godfrey did not argue punitive damages as a reason for allowing discrimination claims based on article I, section 6 in Iowa. The State thus had no opportunity—let alone the obligation—to rebut an argument that God-frey did not make, and that was developed for the first time in today’s lead opinion.

. The fourth constitutional claim, Count VIII, names only the State as a defendant.

. “[T]he State and its political subdivisions are not subject to punitive damages as the goals of punishment and deterrence are not served when punitive damages are imposed against the State, and the innocent taxpayer is ultimately the one who is punished.” 57 Am. Jur. Id Municipal, County, School, and State Tort Liability § 611, at 620 (2012).

. This did not, of course, leave our courts powerless to remedy illegal and unconstitutional acts through injunctive relief. As we said in one case:
Appellant does not attempt to obtain money from the state, -interfere with its sovereignty, or the administration of its affairs through proper agencies. On the other hand, he only wants to protect his property from destruction by the agents of the state, who exceed their authority and thereby seek to take it from him, not with, but without, legal right and in opposition to a legislative guarantee. Clearly the power of the courts to restrain state officials from violating plain provisions of the statute and Constitution is in no way derogatory to the general and well-recognized rule that the state cannot be sued without its consent.
Hoover v. Iowa State Highway Comm'n, 207 Iowa 56, 61, 222 N.W. 438, 440 (1928).

. The lead opinion claims that our territorial supreme court was "well aware” of the English practice of awarding damages for constitutional violations because we cited Entick v. Carrington, 95 Eng. Rep. 807 (C.P. 1765), in an 1855 decision. See Sanders v. State, 2 Iowa 230, 239 (1855). A closer examination of Sanders shows that we relied on Entick in striking down a statute that we determined operated as a general warrant in violation of article I, section 8 of the Iowa Constitution. Id. at 239-43 (reasoning that general warrants had been "entirely unknown” "since the decision of Lord Camden, in [Entick] v. Carrington”). In other words, Entick was cited for an entirely different point in 1855 than the lead opinion cites it for today.